Owen D. OKSANEN, M.D.,
Plaintiff–Appellant,

v.

PAGE MEMORIAL HOSPITAL; J.R. Holsinger, M.D.; Romulo Ancheta, M.D.; Fang S. Horng, M.D.; James G. Dale, M.D., Defendants–Appellees,

American Hospital Association; The Virginia Hospital Association, Amici Curiae.

No. 89–1768.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 5, 1991.

Decided Sept. 4, 1991.

As Amended Sept. 12, 1991.

698

Edward B. Lowry, Michie, Hamlett, Lowry, Rasmussen & Tweel, P.C., Charlottesville, Va., argued (Robert W. Jackson, Charlottesville, Va., Sheldon Braiterman, Baltimore, Md., on brief), for plaintiff-appellant.

Judith Bowles Henry, Crews & Hancock, Richmond, Va., argued (Lynn Fleming, Karen L. Gould, Richmond, Va., for defendant-appellee Dale; Stephen L. Altman, Vicki J. Hunt, Montedonico & Mason, Fairfax, Va., for defendant-appellee Horng; Norman F. Slenker, Slenker, Brandt, Jennings & Johnston, Fairfax, Va., Edward M. Burns, II, Poindexter, Burns & Marks, Waynesboro, Va., for defendant-appellee Holsinger; Phillip C. Stone, Gregory T. St. Ours, Wharton, Aldhizer & Weaver, Harrisonburg, Va., for defendant-appellee Page Memorial Hosp.; Mary S. Meade, Meade & Associates, P.C., Vienna, Va., for defendant-appellee Ancheta, on brief), for defendants-appellees.

Frederic J. Entine, Jeffrey M. Teske, Tracey L. Fletcher, American Hosp. Ass'n, Chicago, Ill., Heman A. Marshall, III, Woods, Rogers & Hazlegrove, Roanoke, Va., for amicus curiae American Hosp. Ass'n.

John J. Miles, Phillip A. Proger, Jones, Day, Reavis & Pogue, Washington, D.C., for amicus curiae Virginia Hosp. Ass'n.

Before ERVIN, Chief Judge, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, WILKINSON, WILKINS, and NIEMEYER, Circuit Judges, and BUTZNER, Senior Circuit Judge, sitting in banc.

## OPINION

WILKINSON, Circuit Judge:

Appellant Dr. Owen D. Oksanen contends that the Sherman Antitrust Act was violated when the medical staff of Page Memorial Hospital allegedly conspired amongst itself and with the hospital's Board of Trustees to revoke Oksanen's staff privileges. Whether such conspiracies are cognizable under federal antitrust law has significant implications for the nation's health care system because the peer review process that Oksanen challenges has become an important element of hospital governance.

In our view, the Board of Trustees and the medical staff of Page Memorial comprised a single entity during the peer review process. Because an entity cannot conspire with itself, the Board and the staff lacked the capacity to conspire. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). While the members of a medical staff may have the capacity to conspire among themselves, such a conspiracy did not occur in this case. We likewise affirm the district court's dismissal of Oksanen's other claims and its refusal to cloak in federal antitrust law what is in essence a workplace dispute.

### I.

Upon completing a residency program in 1978, Dr. Owen D. Oksanen began practicing family medicine in Luray, Virginia. Luray is located in Page County, a county of approximately 18,000 residents. In 1979, Oksanen received full medical staff privileges at the sole hospital in Page County, the fifty-four bed Page Memorial Hospital.

This hospital, like many others, has an organizational structure with three compo-

nents. First, the Board of Trustees operates as the hospital's governing body with final decisionmaking authority on issues affecting the hospital. Second, day to day management of the hospital is vested in a hospital administrator. In this case, John S. Berry was the administrator responsible for supervising the hospital's staff of nurses, laboratory personnel, and other providers of services. Third, the physicians at the hospital are organized as a medical staff. Dr. Oksanen became a member of the staff by virtue of being granted staff privileges. Other members of the medical staff included Dr. Ancheta who primarily practiced general surgery, Dr. Horng who was also a surgeon, Dr. Holsinger a family practitioner, and Dr. Dale who was admitted to the staff in August of 1983 and practiced as an internist.

Page Memorial itself does not directly employ the physicians on the medical staff, but rather provides a facility for physicians to treat those of their patients who need hospital care. The hospital encourages physicians to seek staff privileges by providing staff members with office space and allowances for expenses. As part of the medical staff's relationship with the hospital, it engages in a process known as peer review. During peer review, the members of the medical staff make recommendations to the Board on whether physicians meet the standards for practicing medicine at the hospital in the first instance and on whether a physician will be able to continue practicing once he or she has been accorded staff privileges.

Almost immediately after the medical staff granted privileges to Oksanen the complaints about his conduct began. For example, in October 1979, administrator Berry wrote to Oksanen questioning his attitude toward the use of laboratory facilities and the treatment of laboratory personnel. The chronicle of complaints pertaining to Oksanen's abusive attitude mounted over time. Oksanen reportedly addressed or referred to hospital employees and third party professional reviewers with profanity. In another incident, this time in the emergency room, he termed the mother of a young patient a "red neck from Stanley." Many of Oksanen's outbursts were made publicly and disrupted hospital operations. One nurse who worked with him commented that he "has a volatile personality and you just don't know when it's going to erupt."

Oksanen contends that the friction which developed at the hospital could not be attributed to him alone. He responds that his actions simply reflected his concern with the quality of patient care at the hospital. For instance, he states that he questioned whether Drs. Horng and Ancheta recognized the appropriate limitations on their surgical abilities. As a result, he began referring his patients to other hospitals where he contended they would receive a better quality of care. Oksanen also claims that his poor relationship with Dr. Holsinger stemmed from his earlier refusal to accept a position in Dr. Holsinger's office.

Unfortunately, relations between Oksanen and other members of the hospital and medical staffs only worsened over time. In May of 1983, Oksanen publicly reprimanded a nurse and her supervisor for allegedly providing poor care to his patients. When the nurses attempted to respond, Oksanen refused to discuss the matter, threw down his charts, and left the area. Oksanen's actions spurred hospital administrator Berry to request that the medical staff, in accordance with Medical Staff Bylaws, investigate the incident. The medical staff declined, however, to take disciplinary action against Oksanen.

Oksanen's involvement in another incident, however, did motivate the hospital to take action against him. In response to a letter to all physicians from the President of the Board seeking a harmonious working environment, Oksanen wrote the Board that its letter was "demeaning [and] insulting." Oksanen further indicated that he would not cooperate with the Board's efforts unless the Board retracted its letter and a Trustee personally retrieved the letter from his office. The Board of Trustees discussed Oksanen's response at its July 12, 1983 meeting. Dr. Holsinger, the only physician who also served on the Board,

was absent from the meeting. Dr. Ancheta and administrator Berry both told the Board that they believed disciplinary actions against Oksanen were appropriate. The Board voted unanimously to request that the medical staff take corrective action against Oksanen. The Board, based on the staff's earlier refusal to take action against Oksanen, warned that if action was not taken against Oksanen, it would be forced to evaluate more thoroughly his hospital privileges during the annual credentialing process.

In response, the medical staff voted to revoke Oksanen's staff privileges. Oksanen then appealed this decision to a joint conference committee comprised of Dr. Ancheta and two members of the Board. This committee heard testimony from sixteen witnesses, including Oksanen. Some witnesses testified to Oksanen's competence, while other witnesses testified to the corrosive impact of Oksanen's behavior on staff morale and relations. For instance, the committee heard testimony that Dr. Oksanen initially rebuffed a suggestion by administrator Berry that they meet to discuss a concern about patient care raised by Oksanen. Then one night around 10:30 p.m. Oksanen called Berry at home demanding that they meet later that night to discuss the concern and stating that he would call back every twenty minutes until a meeting was arranged. Eventually Oksanen agreed to meet with Berry, two nursing supervisors, and the Chief of Staff the next morning at the hospital, but Oksanen failed to appear for the meeting even though he apparently was in the hospital and had been paged. After considering the body of evidence relating to Oksanen, the joint conference committee recommended to the Board that, at a minimum, his privileges be suspended.

The Board then in October of 1983 held a meeting at which Oksanen and his attorney argued against the committee's recommendation. The Board voted 9–2, with Dr. Holsinger abstaining, to suspend Oksanen's privileges for a two-month period, to be followed by a grant of privileges on a one-year probationary basis. The Board also stated that members of the medical and hospital staffs would be expected to cooperate with Oksanen during his probationary period.

Around the time of the suspension, public interest in Oksanen's relationship with the hospital began to increase, stimulated in part by Oksanen's own actions. A few days after the suspension, Oksanen held a news conference at which he appealed for community support in his confrontation with the hospital. During the conference, he also questioned the competence of one surgeon practicing at Page Memorial and expressed his belief that Dr. Holsinger's alleged control over the local nursing home was preventing him (Oksanen) from admitting patients to the home. A group of Oksanen's patients formed the nucleus of a committee that campaigned to elect their representatives to the Hospital's Board of Trustees. Four representatives were elected to the Board, including a replacement for Dr. Holsinger.

Oksanen made some conciliatory gestures toward the medical staff when he began his probationary period in January, 1984. It appears, however, that relations between the medical staff and Oksanen had been irreparably harmed. During the probationary period, Oksanen and the medical staff traded charges that they were not living up to the conditions imposed on them by the Board. The hospital administration continued to receive further complaints relating to Oksanen's disruptive behavior. On May 8, 1984, the Board of Trustees again requested the medical staff to take corrective actions against Oksanen. This set in motion the same administrative process that previously had evaluated Oksanen's conduct. The joint conference committee heard, among other things, testimony expressing concern that Oksanen's delay in providing care threatened the welfare of a mother and her newborn child. Hospital and medical staff members also complained that Oksanen's failures to communicate with them and to fulfill his duties to provide emergency room coverage jeopardized patient care. The medical staff eventually recommended that Oksanen's privileges be permanently revoked. Before the Board

made a final decision, Oksanen resigned from the staff on June 27, 1984.

After his resignation, Oksanen remained on the staff at nearby Shenandoah Memorial Hospital and he continued to practice medicine in Virginia through the end of 1984. In September, 1984 the Virginia Board of Medicine initiated disciplinary proceedings against Oksanen. These proceedings concluded in a consent order reprimanding Oksanen for practicing medicine without a valid license and for negligence in the death of a patient in March, 1984.

In 1988, Oksanen brought suit against Page Memorial and the members of its medical staff. He contended that the revocation of his staff privileges and other activities allegedly engaged in by the defendants violated sections one and two of the Sherman Act, the Virginia Antitrust Act, and other state law provisions. On the section one claim, the district court recognized that as a matter of law the defendants may have lacked the capacity to conspire, but did not base its decision on intracorporate immunity. Instead, the court concluded that Oksanen had failed to prove the existence of a conspiracy. The court then granted summary judgment for the defendants on all counts.

Oksanen appealed from that judgment. The defendants argued that they were legally incapable of conspiring. A panel of this circuit concluded, to the contrary, that defendants had the capacity to engage in an antitrust conspiracy. The panel went on to reverse the grant of summary judgment, ruling that Oksanen had not been given an adequate opportunity for discovery. *Oksanen v. Page Memorial Hosp.*, 912 F.2d 73 (4th Cir.1990).

The court then voted to rehear the case en banc. We shall address appellant's federal antitrust law claims in Sections II through IV followed by his various state law claims in Section V.

## II.

■ To prove a violation of section one of the Sherman Act, 15 U.S.C. § 1, a plaintiff must show the existence of an agreement in the form of a contract, combination, or conspiracy that imposes an unreasonable restraint on trade. *E.g., White & White, Inc. v. American Hosp. Supply Corp.*, 723 F.2d 495, 504 (6th Cir.1983).[1] Oksanen advances two different but related theories on whether an impermissible contract, combination, or conspiracy existed in this case. He first contends that during the peer review process, the medical staff conspired with the hospital to exclude him from practicing medicine at Page Memorial. Oksanen also argues that the members of the medical staff, during the peer review process and on other occasions, conspired among themselves to exclude him from the market. We shall address these arguments in this section and in Section III address the restraint of trade issues.

### A.

■ Section one of the Sherman Act applies only to concerted action; unilateral conduct is excluded from its purview. *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). Proof of concerted action requires evidence of a relationship between at least two legally distinct persons or entities. Oksanen contends that this plurality requirement is met in this case because the medical staff and

1. Demonstrating that an alleged agreement would affect interstate commerce has been treated as a jurisdictional prerequisite to bringing a section one claim that must be satisfied before the other two elements of such a claim are addressed. *See Summit Health, Ltd. v. Pinhas,* —— U.S. ——, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991). Oksanen notes that the hospital and its staff purchase supplies and receive insurance payments from out-of-state sources and that they treat non-Virginia residents. Oksanen further alleges that the peer review process was used as a vehicle to punish him for sending patients to other area hospitals, which were engaged in interstate commerce. Finally, Oksanen argues that the peer review process serves a gatekeeping function so that an unfavorable review from Page Memorial could affect his ability to obtain staff privileges at other hospitals. Based on the similarity between Oksanen's allegations and those allegations considered by the *Pinhas* Court to affect interstate commerce, we believe that the jurisdictional requirement for an antitrust action is met in this case.

the hospital are legally discrete entities. We think, to the contrary, that the staff is acting as an agent of Page Memorial Hospital during the peer review process and as such is indistinct from the hospital.

Our view is premised upon the principle of intracorporate immunity announced in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). *Copperweld* established that the unilateral actions of a single enterprise are immune from the coverage of section one despite any corresponding restraint on trade. As an example of unilateral conduct, the Court pointed to agreements among corporate officers. "The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals." *Id.* at 769, 104 S.Ct. at 2740–41. Applying that reasoning, the Court held that agreements between a parent corporation and its wholly owned subsidiary are not concerted actions for purposes of section one. The Court noted that a parent and its subsidiary always have a unity of interest so the law's concern with a sudden joining of independent interests is not present in such a case. *Id.* at 771, 104 S.Ct. at 2741.

We think a similar unity of interest is present in the relationship between the hospital and its staff, both of which seek to upgrade the quality of patient care. Oksanen contends, however, that intracorporate immunity should not shield the participants in the peer review process for the simple reason that the medical staff and the hospital, unlike a corporation and its officers, are legally separate entities. *Bolt v. Halifax Hosp. Med. Ctr.*, 891 F.2d 810, 819 (11th Cir.1990). This argument, however, ignores the functional approach to the question of intracorporate characterization which we believe is mandated by the *Copperweld* decision. *Copperweld* in fact criticized the notion that a corporation can conspire with itself because this "looks to the form of an enterprise's structure and ignores the reality." 467 U.S. at 772, 104 S.Ct. at 2742. Consistent with *Copper-*

*weld*, we must examine the substance, rather than the form, of the relationship between the hospital and the medical staff during the peer review process. When we do so, we find ourselves aligned with those circuits recognizing the applicability of intracorporate immunity to peer review proceedings. *Nurse Midwifery Assoc. v. Hibbett*, 918 F.2d 605 (6th Cir.1990); *Nanavati v. Burdette Tomlin Memorial Hosp.* 857 F.2d 96 (3d Cir.1988).

Like a corporation delegating authority to its officers, the Board of Trustees at Page Memorial delegated peer review decisionmaking in the first instance to the medical staff. "As such, with regard to these decisions, the medical staff operated as an officer of a corporation would in relation to the corporation." *Weiss v. York Hosp.*, 745 F.2d 786, 817 (3d Cir.1984). In effect, the medical staff was working as the Board's agent under an "internal 'agreement' to implement a single, unitary firm's policies" of evaluating the conduct and competence of those to whom the hospital extended privileges. *Copperweld*, 467 U.S. at 769, 104 S.Ct. at 2740.

This type of delegation of authority does not implicate the concerns of section one of the Sherman Act. The decision to conduct the peer review process does not represent the sudden joining of independent economic forces that section one is designed to deter and penalize. "[T]here are no strong antitrust concerns that would warrant a departure from traditional concepts of agency since the hospital and medical staff are not competitors." *Nurse Midwifery*, 918 F.2d at 614. Far from being a competitor with the hospital, the medical staff was in fact a natural component of the hospital's management structure.

Indeed, the Supreme Court has cautioned that adopting a rule that penalized coordinated conduct "simply because a corporation delegated certain responsibilities to autonomous units might well discourage corporations from creating divisions with their presumed benefits." *Copperweld*, 467 U.S. at 771, 104 S.Ct. at 2741. Penalizing coordinated conduct in the health care context would not only discourage hospitals from

investing authority in their medical staffs, but it would also discourage staff members from accepting and exercising delegated authority if to do so involved the omnipresent fear of antitrust treble damage suits. One presumed benefit of authorizing the medical staff to conduct the initial peer review is that it allows physicians with expertise in medical care to make an initial evaluation of whether other physicians have achieved a certain level of professional competence. *See* Havighurst, *Doctors and Hospitals: An Antitrust Perspective on Traditional Relationships*, 1984 Duke L.J. 1071, 1130 n. 192. This and other benefits achieved by delegating peer review to the medical staff would likely be lost if the participants in the peer review process were potentially subject to antitrust liability any time they made a decision. Such a threat to the peer review process is at odds with Congress' intent to encourage the process by granting immunity to participants.[2] It was this critical element of delegated authority that was absent in one of the principal cases relied on by appellant, *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440 (9th Cir.1988). In *Oltz*, a group of anesthesiologists acted on their own initiative in their attempt to coerce a hospital to abandon its contract with a nurse anesthetist and enter into an exclusive contract with them. These actions were taken outside the peer review process and did not involve an entire medical staff. Because the "anesthesiologists were not empowered to act for St. Peter's," we believe the case has little relevance to the determination of whether a hospital can conspire with its medical staff during the peer review process. 861 F.2d at 1450.

As an additional aspect of our functional inquiry into the relationship between the hospital and the medical staff, we must assess the degree of control the hospital exercised over the staff during the peer review process. In *Copperweld*, the par-

ent corporation's ability to exercise control over its subsidiary if the subsidiary failed to act in its best interests influenced the Court's decision that the coordinated activities of the two entities should be treated as that of a single enterprise. 467 U.S. at 771–72, 104 S.Ct. at 2741–42. Here, although the Board of Trustees sought advice from the medical staff, the Board could modify the staff's recommendations at any time and it retained ultimate responsibility for all of the hospital's credentialing decisions. In this regard, the by-laws of Page Memorial Hospital provide that "[n]o assignment, referral, or delegation of authority by the Board of Trustees to … the Medical Staff … shall preclude the Board of Trustees from exercising the Authority required to meet its responsibility for the conduct of the hospital." The Board's ultimate control over peer review decisions enables it to employ peer review to pursue its interests.

Moreover, a hospital's interests generally would not be furthered by engaging in a conspiracy to restrain competition among doctors. Given that hospitals compete for the admission of patients, they have an incentive to maximize the number of physicians to whom they grant admitting and staff privileges. If a physician is qualified and does not disrupt the hospital's operations, it is in the hospital's interest to include, not exclude, that physician. *See Weiss*, 745 F.2d at 828. These incentives apply with particular force to this case. Page Memorial was suffering a decline in admissions during the 1980s. As a result, its economic incentive was to maintain the admitting privileges of qualified physicians in the area.

Oksanen seems to suggest that Page Memorial's incentives were different because it wanted to exclude him from the staff in retaliation for referring patients to other hospitals. Appellant's argument ignores

---

**2.** In the Health Care Quality Improvement Act of 1986, Congress specifically found that "the threat of … treble damage liability under Federal antitrust law unreasonably discourages physicians from participating in effective professional peer review." Congress further noted that "[t]here is an overriding national need to

provide incentive and protection for physicians engaging in effective professional peer review." 42 U.S.C. § 11101(4) & (5). This legislation, however, is not controlling in this litigation which concerns events occurring before the Act's effective date.

the realities of the marketplace. If the hospital dismissed him for illegitimate reasons, he could presumably continue to treat at least some of his patients at Shenandoah Memorial Hospital where he remained on staff. Moreover, Page Memorial had to anticipate that Oksanen might obtain admitting privileges at another competitor hospital eager to accord privileges to a physician with his self-proclaimed large patient base. In sum, a hospital "makes its decisions to serve its own interests, not those of the staff, and thus should not be seen as a possible co-conspirator with them." P. Areeda and H. Hovenkamp, *Antitrust Law*, ¶ 1471b (1990 Supp.).

## B.

■ Oksanen argues that even if the hospital and the medical staff are part of the same enterprise, intraenterprise immunity is inapplicable because individual doctors on the medical staff had personal stakes in the outcome of the peer review process. According to Oksanen, the physicians' personal stakes are their medical practices that would benefit if he were eliminated as a competitor. This circuit has observed that an exception to the general rule that a corporation cannot conspire with its officers or agents "may be justified when the officer has an independent personal stake in achieving the corporation's illegal objective." *Greenville Pub. Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir.1974). Since *Greenville* was decided, however, this exception has expanded and in the process has been criticized for, among other things, becoming an exception that threatens to swallow the rule. *See Nurse Midwifery*, 918 F.2d at 615; P. Areeda, *Antitrust Law*, ¶ 1471 (1986).

Given the force of these criticisms, we decline to extend the personal stake exception beyond the rationale underlying the *Greenville* decision. There it was held that the president of the defendant company could conspire with it where he had a financial interest in another firm that competed with the plaintiff and would directly benefit if the plaintiff was eliminated as a competi-

tor. 496 F.2d at 400. Here, only one member of the medical staff, Dr. Dale, could be said to have been in competition with Oksanen when any of the disputed peer review decisions occurred. Dr. Dale's areas of practice apparently overlapped somewhat with Oksanen's, but Dale did not begin practice at Page Memorial until August, 1983—well after much of the basis for disciplining Oksanen was established—and he did not take part in the proceedings leading to Oksanen's suspension. Dr. Holsinger was a family practitioner, like Oksanen, but he was not accepting new patients after 1982. Drs. Horng and Ancheta did not compete with Oksanen, but were surgeons who looked to the general practitioners for referrals. Thus, it is unclear whether any decision to eliminate Oksanen from the market would directly benefit the members of the medical staff. Drs. Holsinger, Horng, and Ancheta could conceivably have attained some benefits in the long-run if their critic, Oksanen, was no longer practicing at Page Memorial. We doubt, however, that these indirect economic interests justify a personal stake exception.

In any event, the more important aspect of *Greenville* for the purposes of peer review is the degree of control the officer or agent with the independent interest exercised over the defendant firm's decision-making process. If the officer cannot cause a restraint to be imposed and his firm would have taken the action anyway, then any independent interest is largely irrelevant to antitrust analysis. *See* P. Areeda, *Antitrust Law*, ¶ 1471d & g (1986). In *Greenville*, the individual who had an interest in another firm was also the defendant company's president, director, and shareholder. Consequently, he could control the defendant company's decisions.

Here, by contrast, the medical staff had no such control. "To give advice when asked by the decisionmaker is not equivalent to being the decisionmaker itself." *Pennsylvania Dental Ass'n. v. Medical Serv. Ass'n.*, 745 F.2d 248, 259 (3d Cir. 1984). The Board of Trustees at Page Memorial requested and encouraged the medical staff to take corrective action against Oksanen. The Board in the end retained

authority over staff privilege decisions at Page Memorial. Because the challenged decision was subject to review by the hospital and because decisionmaking authority in Dr. Oksanen's case was dispersed among a number of individuals, the personal stake exception is inapplicable.

We thus conclude that under the principle of intracorporate immunity, Page Memorial and its medical staff lacked the capacity to conspire during the peer review process.

### C.

■ The question remains whether the medical staff has the capacity to conspire among itself either during peer review or at other times. We recognize that a medical staff can be comprised of physicians with independent and at times competing economic interests. As a result, when these actors join together to take action among themselves, they are unlike a single entity and therefore they have the capacity to conspire as a matter of law. *See Nurse Midwifery*, 918 F.2d at 614. To conclude that members of the medical staff have the capacity to conspire among themselves does not mean, however, that every action taken by the staff satisfies the contract, combination, or conspiracy requirement of section one. *See Cooper v. Forsyth County Hosp. Auth.*, 789 F.2d 278, 281 n. 12 (4th Cir.1986); *Bolt*, 891 F.2d at 819. The Supreme Court in *Monsanto Co. v. Spray–Rite Service Corp.* established the governing standard for what constitutes sufficient evidence to permit the inference of an antitrust conspiracy:

> [T]here must be evidence that tends to exclude the possibility of independent action.... That is, there must be direct or circumstantial evidence that reasonably tends to prove ... a conscious commitment to a common scheme designed to achieve an unlawful objective.

465 U.S. 752, 768, 104 S.Ct. 1464, 1473, 79 L.Ed.2d 775 (1984).

■ Oksanen seems to suggest that the fact that the medical staff met and took action against him through the peer review process proves the existence of a conspir-

acy. Of course, "mere contacts and communications, or the mere opportunity to conspire ... is insufficient evidence from which to infer an antitrust conspiracy in the context of the denial of hospital ... privileges." *Cooper*, 789 F.2d at 281. Simply making a peer review recommendation does not prove the existence of a conspiracy; there must be something more such as a conscious commitment by the medical staff to coerce the hospital into accepting its recommendation. To speak of a conspiracy among a medical staff during the peer review process is not very meaningful in antitrust terms if the staff lacks the final authority to implement any agreement that it does reach. In this case, there is no evidence that the staff attempted to usurp the Board's power to make the final decision on Oksanen's status. Nor is there any evidence that the staff illicitly agreed to exclude Oksanen from the market or engaged in anticompetitive activity outside the official meeting and hearing process.

"That the challenged conduct .... is consistent with legitimate activities also weighs against inferring a conspiracy." *Cooper*, 789 F.2d at 282 n. 14. Here, the conduct of a peer review proceeding, a proceeding mandated by state law and by accrediting agencies, is certainly a legitimate activity designed to enhance the quality of care and to provide a harmonious working environment for all the hospital's staff. That the medical staff's actions during the peer review process were legitimate is further evidenced by the fairness of the procedures used to discipline Oksanen. The defendants made many attempts to resolve the complaints against Oksanen short of taking formal disciplinary actions. When disciplinary action finally was taken, it was incremental: Oksanen was initially placed on probation and only later were his privileges permanently revoked after additional complaints were received about his conduct. Additionally, before Oksanen's privileges were suspended for the first time, a hearing was held at which he was represented by counsel and had the opportunity to call witnesses.

We are not suggesting that the antitrust laws are designed to achieve fairness or due process, but when due process is accorded a disgruntled physician it only enhances the legitimacy of a hospital and medical staff's actions. *See* Havighurst, *Doctors and Hospitals*, 1984 Duke L.J. at 1132–33; *see also* 42 U.S.C. § 11112 (according immunity from antitrust litigation to peer reviewers when certain procedural safeguards are observed). The litany of complaints from a variety of sources concerning Dr. Oksanen provides ample evidence that the doctors on the staff were justified in disciplining a fellow physician who was perceived to be both unprofessional and uncooperative. Where, as here, the peer review process has been operating in accordance with proper procedures, under the aegis of the hospital, and with a substantial basis in the evidence, the likelihood of an antitrust conspiracy is also substantially diminished.

Oksanen, however, points to evidence of actions taken outside of the peer review context that he claims demonstrate that the medical staff engaged in a group boycott of him. For instance, he contends that the medical staff acted in a concerted refusal to provide on-call coverage for him. Dr. Holsinger, however, apparently had no obligation to provide such coverage because of his seniority. Dr. Dale continued to provide on-call coverage for Oksanen through June 1984, while Drs. Ancheta and Horng apparently declined to provide such coverage. The choice of these two doctors not to provide on-call coverage can readily be explained, however, as a result of their earlier alienation from the quarrelsome Oksanen. Quite likely, the medical staff members made independent decisions not to provide assistance to Oksanen when they could not expect much cooperation in return. Such manifestations of human nature are not properly regarded as conspiratorial. Similarly, the other evidence that Oksanen points to in support of his boycott allegations is also the product of his own failure to comply with hospital regulations or the result of individual choices by hospital or medical staff members rather than of any concerted action among the medical staff.

■ Oksanen complains that he was unable to obtain better evidence of a conspiracy among the medical staff because the district court granted summary judgment before he had the opportunity to complete adequate discovery. According to Oksanen, that limitation combined with the particular importance of discovery in antitrust cases means that we should be hesitant to conclude that he has failed to prove that a conspiracy existed among the medical staff.

We believe that discovery was well tailored by the district court to address the pivotal issue in a denial of privileges case: the degree of control the hospital exercised over the peer review process. When a hospital's administration initiates a peer review proceeding and maintains control over it, the likelihood that the medical staff made a meaningful and conscious commitment to restrain trade is markedly decreased. This is not to say, of course, that antitrust concerns would be implicated whenever a medical staff initiates peer review proceedings. The antitrust laws do not prevent physicians from taking legitimate disciplinary action against unprofessional or incompetent practitioners. Many professions have long placed considerable faith in self-regulation, and it would be a blow to public confidence in these professions if the utility of these measures was impaired by an unjustifiably expansive reading of the antitrust laws with their concomitant burdens of discovery.

In this case, the district court had before it thirty-five exhibits submitted by Oksanen, including 690 pages of transcripts from joint conference committee meetings. This voluminous evidence demonstrated that the hospital administrator and the Board, not the medical staff, initiated the actions taken against Oksanen. In fact, the medical staff expressly failed to take advantage of at least one opportunity presented by the hospital administration to discipline Oksanen, which goes far to belie Oksanen's theory of a staff conspiracy. Even with additional discovery, Oksanen would be hard

pressed to foreclose the likelihood that the alleged conspirators acted independently. Furthermore, additional discovery would not diminish the fact that the complaints lodged against Oksanen provided a legitimate basis for the corrective actions taken against him. Oksanen had the opportunity to challenge the validity of these allegations in his submissions on summary judgment.

 Because Oksanen received adequate discovery on the key issues in his suit, the case was ripe for summary judgment. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (approving the use of summary judgment in complex antitrust litigation). This court and others, both before and after *Matsushita,* recognized that summary judgment is an important tool for dealing with antitrust cases. *See Steuer v. National Med. Enterps., Inc.*, 672 F.Supp. 1489, 1500-01 (D.S.C.1987) (collecting cases). "[T]he very nature of antitrust litigation encourages summary disposition of such cases when permissible." *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 475 (7th Cir. 1988). While parties should always be provided an adequate opportunity in discovery to prove a potentially meritorious case, the process should not become so exhaustive and so time consuming that even a favorable judgment will prove hollow. Unnecessary discovery also has the potential, in and of itself, to damage the legitimate purposes of the peer review process. Within this framework, Oksanen has simply failed to meet his summary judgment burden of establishing that "the inference of conspiracy is reasonable in light of the competing inferences of independent action." *Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1356.

### III.

 Oksanen also bears the burden of proving under section one of the Sherman Act that any concerted action that did take place caused an "antitrust injury" by imposing an unreasonable restraint on trade. The focus of the antitrust laws is on pro-

moting competition. *National Collegiate Athletic Assn. v. Board of Regents*, 468 U.S. 85, 103, 104 S.Ct. 2948, 2961, 82 L.Ed.2d 70 (1984). As a result, a plaintiff cannot demonstrate the unreasonableness of a restraint merely by showing that it caused him an economic injury. For example, the fact that a hospital's decision caused a disappointed physician to practice medicine elsewhere does not of itself constitute an antitrust injury. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 31, 104 S.Ct. 1551, 1568, 80 L.Ed.2d 2 (1984). If the law were otherwise, many a physician's workplace grievance with a hospital would be elevated to the status of an antitrust action. To keep the antitrust laws from becoming so trivialized, the reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990).

To assess the reasonableness of a restraint on trade, courts have taken one of two approaches. "In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are 'illegal *per se.*' " *National Soc. of Prof. Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). Certain forms of agreements, such as varieties of group boycotts, have been classified as per se violations. *See FTC v. Superior Ct. Trial Lawyers Ass'n.*, 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990). Oksanen seems to contend that the combined actions of the hospital and the medical staff amounted to a group boycott and should be classified as per se violations of the Act. The Court has cautioned, however, that the category of restraints classed as group boycotts should not be expanded indiscriminately, particularly where, as here, the economic effects of the restraint are far from clear. *FTC v. Indiana Fed. of Dentists*, 476 U.S. 447, 458-59, 106 S.Ct. 2009, 2017-18, 90 L.Ed.2d 445 (1986).

We believe that the second approach to analyzing restraints, the rule of reason, is applicable to this case. Under the rule of reason, Oksanen bears the burden of proving that the actions of the defendants have unreasonably restrained trade. *See, e.g., Hyde,* 466 U.S. at 29, 104 S.Ct. at 1567. To meet this burden, Oksanen must prove what market he contends was restrained and that the defendants played a significant role in the relevant market. Absent this market power, any restraint on trade created by the defendants' actions is unlikely to implicate section one.

Oksanen asserts, with little proof, that Page County is the relevant market and that Page Memorial and its medical staff exert complete control over the market. Although Page Memorial may be where Oksanen prefers to practice, this preference alone does not justify excluding other hospitals and other doctors from the relevant market definition. *See Steuer,* 672 F.Supp. at 1510 n. 19. Oksanen's narrow market definition violates a fundamental tenet of antitrust law that the relevant market definition must encompass the realities of competition. *See United States v. Grinnell Corp.,* 384 U.S. 563, 572–73, 86 S.Ct. 1698, 1704–05, 16 L.Ed.2d 778 (1966). The defendants note that they compete with hospitals and doctors in surrounding counties. For example, four hospitals, aside from Page Memorial, are situated within twenty-five miles of Page County. Based on statistics derived from a 1979 study, Page Memorial's share of the market served by these five hospitals is 5.2%. Moreover, 53.8% of Page County's residents went to hospitals other than Page Memorial, including Rockingham Memorial which attracted 30% of all Page County residents in 1979. Under these circumstances, we doubt whether the defendants possess the market power necessary to significantly restrain trade.

Of course, a detailed inquiry into a firm's market power is not essential when the anticompetitive effects of its practices are obvious. *Federal Trade Commission v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 110 S.Ct. 768 at 780–82, 107 L.Ed.2d 851. If any anticompetitive effects exist in this case, however, they are far from clear. For instance, Oksanen has neither demonstrated a rise in the price of medical services above a competitive level nor a decrease in the supply of doctors in the relevant market. *See Nanavati,* 857 F.2d at 121 n. 24. In fact, from August 1983 to 1987 seven additional doctors began practicing at Page Memorial. The aphorism that "the antitrust laws were enacted for 'the protection of *competition,* not *competitors'* " rings true in this case. *Atlantic Richfield,* 110 S.Ct. at 1891 (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)). This case is not one in which a representative of a class of competitors is being excluded from the market. *Cf. Oltz* (attempt to exclude nurse anesthetist); *Cooper* (attempt to exclude podiatrists); *Weiss* (attempt to exclude osteopath). Oksanen, as an individual competitor, may have been hurt by the hospital's decision to revoke his privileges, but there is no evidence that competition as a whole in the relevant market has been harmed.

Moreover, the peer review process, by policing the competence and conduct of doctors, can enhance competition. "By restricting staff privileges to doctors who have achieved a predetermined level of medical competence, a hospital will enhance its reputation and the quality of care that it delivers." *Weiss,* 745 F.2d at 821 n. 60. Similarly, the friction created between a hospital and a doctor with a legacy of trouble in interpersonal relationships can decrease efficiency, discourage other qualified doctors from joining the staff, and detract from a hospital's ability to provide quality patient service. *Id.*

In sum, the anticompetitive effects are by no means so clear and one-sided as Oksanen would have them, and the revocation of Oksanen's staff privileges, while undoubtedly impacting adversely on his practice, has not been shown to have had any adverse impact on competition in the relevant market. Consequently, his section one claim fails.

## IV.

■ Oksanen further contends that the defendants violated section two of the Sherman Act by participating in the offenses of monopolization and conspiracy to monopolize. While section one of the Act focuses on concerted action, monopolization under section two involves the actions of a single firm to control a market. Here, Oksanen appears to contend that Page Memorial was engaging in efforts to monopolize trade by excluding him from the hospital in response to his referral of patients to other hospitals. Two elements comprise the offense of monopolization: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 n. 19, 105 S.Ct. 2847, 2854 n. 19, 86 L.Ed.2d 467 (1985) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)).

■ Although some dispute about the relevant market exists among the parties, Oksanen has offered little or no evidence to support his proposed definition of Page County as the relevant market. It is difficult to understand how Oksanen can maintain his proposed market definition since he himself sent a significant number of patients to hospitals outside of Page County. As our prior discussion has indicated, we doubt whether Page Memorial exercised market or monopoly power in a market defined to account for commercial reality.

Even assuming that Oksanen could demonstrate the existence of monopoly power, he must still prove that Page Memorial willfully acquired such power or sought to maintain it. To satisfy this burden, Oksanen must show "that a jury could find no valid business reason or concern for efficiency in the hospital's choice" to revoke his privileges. *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98 at 105 (4th Cir.1987). As we have noted repeatedly,

Page Memorial certainly had valid business and patient care reasons for removing Oksanen before he irremediably poisoned the hospital environment. Consequently, Oksanen has failed to demonstrate the monopolistic intent necessary for a section two claim.

■ Oksanen also argues that the medical staff conspired with the hospital and among itself to monopolize the market for medical services. These claims merit little discussion. Because the hospital and medical staff lack the capacity to conspire under section one, they also lack the capacity under section 2. *Advanced Health–Care Serv. v. Radford Comm. Hosp.*, 910 F.2d 139, 150 (4th Cir.1990). On the claim that the medical staff conspired among itself, "because we find that appellant[ ] failed to proffer sufficient evidence of a conspiracy in violation of § 1 of the Sherman Act to withstand summary judgment, we accordingly find [his] § 2 claim similarly deficient." *Cooper*, 789 F.2d at 280 n. 10.

## V.

As Oksanen's final grounds for appeal he asserts three state law claims against the defendants. Specifically, Oksanen contends that the defendants violated the Virginia Antitrust Act, conspired to injure his business in violation of Va.Code § 18.2–500, and that the doctors on the medical staff tortiously interfered in his contractual relations with a number of parties. We shall briefly address each of these claims.

■ The Virginia Antitrust Act, with the exception of an interstate commerce component, shares common elements with sections one and two of the Sherman Act. Va.Code Ann. § 59.1–9.1, *et seq.* (1990). In fact, the Virginia Act specifically provides that it is to be interpreted and applied in harmony with federal antitrust law. Va. Code Ann. § 59.1–9.17. Because Oksanen has failed to establish his restraint of trade and monopoly claims under federal law, his state law antitrust claims likewise fail. *See Satellite Television, Inc. v. Continental Cablevision Inc.*, 714 F.2d 351, 358 n. 13 (4th Cir.1983).

In Oksanen's second state law count he alleges that the defendants conspired to injure his business in violation of Va.Code § 18.2–500. As our review of the evidence has indicated, Oksanen has failed to establish that any of the defendants conspired against him, much less conspired with the intent to maliciously injure him as required under § 18.2–500. *Allen Realty Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592, 596 (1984).

Oksanen also contends that the doctors on the medical staff interfered in his contractual relations with (1) Page Memorial, (2) a nursing home, and (3) his individual patients. We agree with the district court that plaintiff has simply failed to introduce the evidence necessary to sustain his burden of proof on these issues.

## VI.

This case illustrates well the dilemma that hospitals face when they consider disciplining a physician by altering his admitting privileges. On the one hand, if the hospital failed to discipline a physician against whom documented complaints were legion, the efficiency of the entire institution could be affected and the hospital could even be exposing itself to malpractice liability. Yet, if the hospital takes corrective action, it and its medical staff face the prospect of a disgruntled physician bringing an antitrust suit against them.

In our view, the antitrust laws were not intended to inhibit hospitals from promoting quality patient care through peer review nor were the laws intended as a vehicle for converting business tort claims into antitrust causes of action. While we cannot say that no peer review decision would ever implicate the Sherman Act's concern for competition, this assuredly is not such a case. Page Memorial simply took measured steps to discipline an imperious physician. In taking these actions, Page Memorial and its medical staff have violated neither federal nor state law. The judgment of the district court is therefore

AFFIRMED.

MURNAGHAN, Circuit Judge, dissenting:

Of late, this Circuit, sitting *en banc*, has brought a number of plaintiffs' quests to an end at the summary judgment stage. *See, e.g., McCormick v. AT & T Technologies, Inc.*, 934 F.2d 531 (4th Cir.1991) (*en banc*) (affirming district court's dismissal of plaintiff's claim on summary judgment); *Gould v. United States Dep't of Health & Human Serv.*, 905 F.2d 738 (4th Cir.1990) (*en banc*) (same), *cert. denied*, — U.S. ——, 111 S.Ct. 673, 112 L.Ed.2d 666 (1991); *Paroline v. Unisys Corp.*, 900 F.2d 27 (4th Cir.1990) (*en banc*) (same). *But see Rowland v. Patterson*, 882 F.2d 97 (4th Cir. 1989) (*en banc*) (reversing district court's dismissal of plaintiffs' claims on summary judgment). Perhaps one explanation may be the favorable reception that summary judgment has received from the Supreme Court in recent years. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

But I do not believe that the Supreme Court has moved further to close the gates of the judiciary by encouraging district courts prematurely to stay discovery before discovery has been completed. Indeed, the Court has expressed concern that plaintiffs be given appropriate opportunity to complete discovery. In *Anderson*, the Court wrote that "the plaintiff must present affirmative evidence ... even where the evidence is likely to be within the possession of the defendant, *so long as the plaintiff has had a full opportunity to conduct discovery.*" 477 U.S. at 257, 106 S.Ct. at 2514 (emphasis added). In *Celotex*, the Court emphasized that "[t]he parties had conducted discovery, and no serious claim can be made that respondent was in any sense 'railroaded' by a premature motion for summary judgment." 477 U.S. at 326, 106 S.Ct. at 2554. Indeed, in *Matsushita*, an antitrust case, the Court noted that the petitioners had "several years of detailed discovery...." 475 U.S.

at 578, 106 S.Ct. at 1351. Thus the Supreme Court has not altered the position that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976) (*quoting Poller v. Columbia Broadcasting*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962)); *see Huelsman v. Civic Center Corp.*, 873 F.2d 1171, 1174 (8th Cir.1989); *Greensboro Lumber Co. v. Georgia Power Co.*, 844 F.2d 1538, 1545–46 (11th Cir.1988).[1]

Yet the majority has thrown out Oksanen's suit without permitting him a reasonable time to complete discovery. Oksanen filed his complaint in June 1988. The defendants answered in July and in September, 1988 filed motions to dismiss and, in the alternative, for summary judgment. The judge scheduled argument on the motions for November 7, 1988. Oksanen responded to interrogatories and requests for production of documents by two of the defendants. He served requests for interrogatories and depositions on the defendants; however, the defendants did not respond. After the November argument, the judge stayed all discovery and then granted the motion for summary judgment and dismissal.

Both the district court judge and the majority found persuasive the extensive official paper record presented to the court. Few defendants in antitrust cases will have problems flooding the court with voluminous materials supporting the absence of any violations. Harder, however, is the plaintiff's burden of showing an antitrust violation. But the difficulty of the task does not justify refusing to permit discovery. Like the district court, the majority bases its disposition on the lack of evidence presented by Oksanen of conspiracy among the medical staff.[2] I would be surprised indeed if the medical staff would have openly discussed, at any meeting with records available to Oksanen, a plan to conspire against him. Thus, Oksanen, without access to the files or minds of the defendants, obviously could not obtain such evidence in the absence of discovery.

The majority, recognizing Oksanen's inability to complete discovery, claims that "[w]hen a hospital's administration initiates a peer review proceeding and maintains control over it, the likelihood that the medical staff made a meaningful and conscious commitment to restrain trade is markedly decreased." At 707. It continues by explaining that the evidence presented by the defendants support their side of the story, Oksanen "would be hard pressed to foreclose the likelihood that the alleged conspirators acted independently," and "additional discovery would not diminish the fact that the complaints lodged against Oksanen provided a legitimate basis for the corrective actions taken against him." At 708. Therefore, it concludes Oksanen had adequate discovery.

That the defendants have a good story and a paper record should not bar a plaintiff from attempting to demonstrate that the defendants' explanation is a cover for less permissible actions. That Oksanen will be "hard pressed" does not justify the majority's preventing him from trying. That the complaints present one plausible explanation should not end Oksanen's effort to establish another. The discovery presumption created by the majority will

---

1. The majority's cite to *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473 (7th Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988), is inapposite. In *Collins,* discovery had been completed prior to summary judgment and the court noted that the district judge "painstakingly examined the voluminous discovery material...." *Id.* at 475.

2. For example, in part C, the majority declares that "there is no evidence that the staff attempted to usurp the Board's power ..." At 706. It

adds, "Nor is there any evidence that the staff illicitly agreed to exclude Oksanen from the market or engaged in anticompetitive activity outside the official meeting and hearing process." *Id.* And it guesses as to the motivation of two doctors' refusal to provide on-call coverage for him: "Quite likely, the medical staff members made independent decisions not to provide assistance to Oksanen when they could not expect much cooperation in return." At 707.

bar all plaintiffs save those who have the "smoking gun" already clutched in their hands. With the courts crowded, it may be tempting to hold that every plaintiff may not deserve the proverbial day in court, but no exceptional circumstances justified staying Oksanen's discovery. If things are as the majority has prematurely decided, Oksanen's completion of discovery will bring about no different result. But a guess is not as satisfactory as a conclusion reached after full discovery with pertinent facts available to the district judge. The grant of summary judgment may ultimately be shown to be correct, but that should come after adequate opportunity for discovery. There was no such opportunity here.

I, therefore, respectfully dissent.

ERVIN, Chief Judge, PHILLIPS, Circuit Judge, and BUTZNER, Senior Circuit Judge, have joined in this dissent.