William J. REA, M.D., et al., Plaintiffs,

v.

**HOSPITAL CORPORATION OF AMERICA, et al.,**
**Defendants.**

Civ. A. No. 3:89–CV–0454–P.

United States District Court,
N.D. Texas,
Dallas Division.

Dec. 30, 1993.

Order Granting in Part and Denying in Part Motions Sept. 26, 1994.

Stephen A. Coke, Richard W. Winn, Wesner, Coke, Boyd & Clymer, P.C., Dallas, TX, for plaintiffs.

Patton G. Lochridge, Lin Hughes, McGinnis, Lochridge & Kilgore, L.L.P., Austin, TX, for defendants.

## MEMORANDUM OPINION AND ORDER

SOLIS, District Judge.

This lawsuit was filed by two physicians against the hospital where they formerly practiced, against the hospital's administrator and four doctors. The Plaintiffs practiced environmental medicine and admitted patients to Bedford Northeast Community Hospital's ("BNECH") Environmental Care Unit ("ECU"). The suit arises from the suspension of the privileges of Drs. Rea and Johnson to practice at the hospital and from the subsequent closing of the hospital's ECU.

At the time of the actions complained of in the suit, Defendant Dr. Jim Linton was Chief of Staff at Bedford Northeast Community Hospital and Defendant Robert Martin was the hospital administrator. Defendant Drs. Paul Haberer, Richard Feingold and Barry Firstenberg were members of an ad hoc committee appointed by Dr. Linton to look into complaints made against the Plaintiffs. Dr. Haberer was also Dr. Linton's predecessor as hospital Chief of Staff. Defendant Hospital Corporation of America was dismissed from the lawsuit prior to trial.

The parties waived trial by jury, and the case was tried before the Court. Plaintiffs alleged causes of action under the federal and state anti-trust statutes, as well as claims for breach of contract, fraudulent and negligent misrepresentations, slander and business disparagement, and tortious interference with contractual relations.

### FACTS

Sometime in January 1987, the hospital pharmacy alerted Administrator Martin of concerns with the drug regimen of two of Plaintiffs' patients in the ECU. Martin passed these concerns on to Dr. Linton who was Chief of Staff. At a meeting of the

hospital's Medical Executive Committee on January 22, 1987, these concerns were discussed and Dr. Linton appointed an ad hoc committee to review certain ECU patients' charts. The doctors appointed to the ad hoc committee were Drs. Paul Haberer, Barry Firstenberg, Richard Feingold, and Jeffrey Mills.

The ad hoc committee met for the first time on February 13, 1987, and spent two to three hours reviewing the charts of four of Plaintiffs' patients who were in the ECU.[1] On the morning of February 16, 1987, Dr. Linton and Administrator Martin met to discuss the findings of the ad hoc committee and decided to summarily suspend the privileges of Drs. Rea and Johnson effective immediately. Later that morning, Dr. Johnson was called into an office with Martin and Drs. Linton and Firstenberg present and was informed of the decision. This was the first notice either Drs. Rea or Johnson had received of concerns over treatment of some of their ECU patients or that the hospital was looking into these concerns. Drs. Rea and Johnson were not contacted by anyone prior to the meeting of the ad hoc committee or prior to the decision to summarily suspend them.

Dr. Johnson was told at the meeting of February 16th, that he and Dr. Rea could care for their ECU patients until noon on February 18th. Dr. Johnson agreed to contact other doctors about resuming the care of Plaintiffs' ECU patients.

The hospital's Medical Executive Committee ("MEC") met on February 18, 1987, and ratified the summary suspension of Plaintiffs. Dr. Johnson, when informed of the summary suspension, requested to meet with the MEC on February 18th, but the request was denied because the MEC wanted to meet first without the Plaintiffs present.

On February 26, 1987, the MEC heard from Drs. Rea and Johnson for the first time and voted to continue the summary suspensions.

Dr. Linton, in keeping with hospital guidelines, then appointed a Fair Hearing Committee whose function was to review the summary suspensions. The Fair Hearing Committee met on March 27th. The hearing lasted approximately seventeen hours and numerous witnesses testified.

The Fair Hearing Committee subsequently voted to reinstate Plaintiffs' privileges, and found no impropriety of drug regimen by Drs. Rea and Johnson.

On March 26, 1987, the day before the date of the Fair Hearing, Martin closed the ECU.

After receiving the report of the Fair Hearing Committee the MEC reinstated Drs. Rea and Johnson's privileges but placed them on probation for twelve (12) months. Plaintiffs appealed the portion of the MEC's decision placing them on probation, and in June 1987, the hospital's Board of Trustees voted to reinstate Plaintiffs without placing them on probation.

Subsequent negotiations followed between Plaintiffs and Martin about the reopening of the ECU. In December 1987, those negotiations concluded unsuccessfully when Martin informed Drs. Rea and Johnson that the ECU would not be reopened by the hospital.

### ANTITRUST CLAIM

Plaintiffs allege that the Defendants' actions in summarily suspending them and in closing the Environmental Care Unit constitute violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and of the Texas Anti-Trust Statute, Texas Bus. & Comm.Code Ann. § 15.01 et seq.

The parties disagree as to whether a hospital can conspire with doctors on its staff for purposes of the anti-trust statutes. However, based on the evidence before the Court, it is not necessary to resolve that issue.

██ The Court finds that Plaintiffs have failed to establish that the suspension of their privileges or the closing of the ECU was the result of anti-competitive concerted action on the part of the Defendants. If a

---

1. Only Drs. Haberer, Mills and Feingold met to review the charts. Dr. Firstenberg was out of town and did not attend the meeting.

conspiracy did exist among the Defendants, it was not economically motivated. Plaintiffs presented evidence that generally all doctors are in competition with each other and that Plaintiffs competed with the hospital. Additionally, Plaintiffs presented painstaking testimony of the various illnesses treated by environmental medicine practitioners. Plaintiffs' patients had a wide array of illnesses and complaints and many had been treated by many doctors from many medical specialties. These included specialties practiced by the Defendant doctors. Plaintiffs' theory is that once Plaintiffs could no longer treat their patients because of the suspension of their privileges and the closing of the ECU, then these patients could be treated by other doctors, including Defendants.

The Court, however, finds that while Plaintiffs' theory may be true in the abstract, the facts of this case do not substantiate that theory. The evidence showed that many of Plaintiffs' patients were from Canada. There was no evidence that any of Plaintiffs' patients had ever been treated by, were referred by, or were ever treated afterward by any of the Defendant doctors.

In sum, the Court finds that there is no evidence that any of the individual doctor Defendants stood to benefit economically from the suspension of Plaintiffs' privileges or the closing of the ECU. The Court further finds that the Defendants' actions were not shown to have unreasonably restrained competition. *Kiepfer v. Beller*, 944 F.2d 1213 (5th Cir.1991).

Additionally, the Court finds that there was no conspiracy between the hospital and the Defendant doctors as to the closing of the ECU. The closing of the ECU was a unilateral act on the part of the hospital, acting through Martin, and does not violate § 1 of the Sherman Act or the Texas Anti–Trust Statute. *Monsanto Co. v. Spray–Rite Service, Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *Red Wing Shoe v. Shearer's, Inc.*, 769 S.W.2d 339 (Tex.App.— Houston [1st Dist.] 1989).

Accordingly, it is **ORDERED** that Plaintiffs take nothing on their federal and state anti-trust claims.

## BREACH OF CONTRACT

■ Plaintiffs contend that when they agreed to bring their patients to BNECH the hospital agreed to make the ECU available to Plaintiffs. Further, Plaintiffs allege that BNECH agreed that the ECU would not be closed until Rea and Johnson were provided adequate notice to allow them to find an acceptable substitute for their patients. Specifically, Plaintiffs contend that the hospital agreed to give them at least nine months notice before closing the ECU.

The evidence indicates that there was no written agreement between the parties. Neither have the Plaintiffs produced any documentary evidence of an agreement or of any notice requirement before closing of the ECU.

The Court notes that the first and second complaints filed by Plaintiffs in this case do not allege a nine month notice agreement before closing of the ECU. In a deposition taken prior to trial, Plaintiffs testified that the parties never agreed to a definite time of notice which had to be given, but that by implication, the parties agreed to a notice of three to six months in order for Plaintiffs to have sufficient time to find another place for their patients.

Additionally, John Miller, the Hospital Administrator with whom Plaintiffs allegedly made the agreements, testified that there was no agreement with Plaintiffs and there was no agreement for the hospital to give notice before it closed the ECU.

Based on the evidence before it, the Court finds that there was no agreement between the hospital and Plaintiffs.

Accordingly, the Court orders that Plaintiffs take nothing on their breach of contract claim.

### Fraud and Negligent Misrepresentation Claims

Plaintiffs' allegations in Counts VI and VII of their Complaint are similar to the allegations in their breach of contract claim.

■ The Court finds that BNECH did not make false or negligent misrepresentations

to Plaintiffs to induce them to practice medicine at the hospital or in telling Plaintiffs that the ECU would be made available to them.

Accordingly, the Court orders that Plaintiffs take nothing on their fraud and negligent misrepresentation claims.

### Slander to Business and Business Disparagement Claims

Plaintiffs contend that their summary suspension for alleged misuse of drug prescriptions for their patients was communicated to various individuals and damaged their personal and professional reputations.

Defendants contend that these claims are subject to the Texas one-year statute of limitations, and are thus barred. Defendants assert that the statements of which Plaintiffs complain were made in 1987, and this suit was not filed until 1989, more than one year after the statements were made.

Under Texas law, a suit alleging defamation or injury to personal reputation must be brought within one year. V.T.C.A., Civ.Prac. & Rem.Code § 16.002; *Gulf Atlantic Life Ins. Co. v. Hurlbut*, 696 S.W.2d 83 (Tex. App.—5th Dist.1985), rev'd on other grounds 749 S.W.2d 762 (Tex.1987). However, a suit for defamation or injury to a business appears to be subject to the two year statute of limitations. *Id.*

The Court of Appeals in *Gulf Atlantic* held that in order to determine whether a defamatory or disparaging statement is subject to the one year statute of limitation, the Court must look beyond the labels in the pleadings. The Court stated that a Plaintiff's "pleadings and proof" must be examined to see whether the primary gravamen of the tort is an injury to the Plaintiff's personal reputation, ... or is a direct injury to the "Plaintiff's business ..." *Gulf Atlantic*, at 98. The Court further stated that the pleadings and proof as to the types of damages suffered and sought should be considered. The Court went on to state, "... if the main complaint is a false statement directly injurious to a business or property interest, and the damages alleged and proved are limited to business or property losses established with the specificity re-

quired for these sort of damages, then the claim may properly be considered as one for business or property disparagement, even though aspects of personal defamation may be incidentally involved. Under this rule, the injured party may sue for both torts in the same suit so long as he avoids duplication of damages, as the Restatement recognizes. Similarly, if the defamation claim is barred because of its shorter limitation period, the disparagement claim will not be barred by the shorter limitation period so long as the injured party does not plead allegations and proof typical of an action for defamation." *Gulf Atlantic*, at 98.

What is clear to this Court, however, is that an action for personal defamation and an action for business disparagement are two distinct torts which protect different interests. The Texas Supreme Court stated as much in its opinion in *Gulf Atlantic*. *Gulf Atlantic* (S.Ct. opinion, at 766). The Supreme Court also explained the higher evidentiary requirements when seeking to recover for business disparagement as opposed to personal defamation. These include a Plaintiff's burden to prove malice and special damages. Also, as the Court of Appeals explained in its opinion, a party may sue for both torts in the same suit.

Count III of Plaintiffs' complaint in this suit can be construed to allege a claim for personal defamation and for business disparagement.

■ Plaintiffs allege that the false statements communicated by Defendants injured their business reputation which caused a loss of earnings and/or earning capacity. These are elements of a business disparagement claim.

■ Plaintiffs also allege that the false statements have caused Plaintiffs to be held to "shame, contempt and ridicule" and have caused them both personal embarrassment and humiliation. (Pl. Second Amend. Orig. Comp. ¶ 39). Plaintiffs then assert damages for mental anguish and emotional distress. These are elements of a claim for personal defamation. The claims for personal defamation are barred by the one year statute of limitations. *Gulf Atlantic*, supra.

The claims for business disparagement are not barred by limitations and remain subject to proof of all required elements.

As stated previously, one of the elements of the tort of business disparagement is proof of special damages. This requires that Plaintiff "establish pecuniary loss that has been realized or liquidated as in the case of specific lost sales." *Gulf Atlantic,* supra. (S.Ct. Opinion, quoting Prosser and Keeton on the Law of Torts).

■ In this case, then, Plaintiffs must show loss of patients or earnings that resulted directly from the alleged false communications made by Defendants.

The Court finds that Plaintiffs have failed to make this showing. As in the *Gulf Atlantic* case, Plaintiffs' alleged damages are the result of the suspension of their privileges and the closing of the ECU rather than the result of any communications made by Defendants.

Accordingly, the Court finds that Plaintiffs take nothing by their business disparagement claims.

### Tortious Interference with Contractual Relations

In Count IV of their Complaint, Plaintiffs allege that Defendants' actions in suspending Plaintiffs' privileges and in closing the ECU interfered with the contracts between Plaintiffs and their patients and with potential contracts with future patients.

In defense of the suspension of the privileges of Drs. Rea and Johnson, the Defendants rely on the immunity provided by art. 4495b, § 5.06(f), V.A.T.S. That statute provided that a member of a medical peer review committee who acts "without malice and in the reasonable belief that such action or recommendation is warranted by the facts known to him ..." is immune from civil liability.

In relation to the decision to close the ECU, Defendants rely on the privilege of legal justification. That is, that BNECH had the right to operate the hospital as it saw fit, and had the right to close the ECU even though it adversely affected Plaintiffs' business relationship with their clients.

### A. Suspension of Privileges

■ For reasons that follow, the Court finds that Defendants' suspension of the privileges of Drs. Rea and Johnson were not done without malice and in the reasonable belief that their actions were warranted by the facts known to them.

As stated previously, Dr. Linton and Mr. Martin made the decision to suspend the privileges of Plaintiffs on February 16, 1987. It is necessary, however, to set the suspensions in the context of previous occurrences between Plaintiffs and Defendants.

In their practice of environmental medicine, Plaintiffs treat patients who experience chronic pain or disease which Plaintiffs believe may be caused or aggravated by chemicals or other agents found in the patient's environment. As part of their treatment of these patients, Plaintiffs performed antigen testing and administered "transfer factor." The patient would be placed in a controlled environment, such as the ECU, and would then be reintroduced to various chemicals to determine sensitivity to that chemical. Transfer factor is a blood product where blood cells are used to fight infections and enhance the immune system. The products used in the antigen testing and the transfer factor were manufactured by Plaintiffs. The products were then taken to the hospital and administered to patients in the ECU.

On September 5, 1986, Medicare performed an inspection at BNECH. On September 17, 1986, the Texas Department of Health ("TDH") sent Mr. Martin a letter notifying him of some deficiencies found by the Medicare inspection. The letter set a timetable for the hospital to remedy the deficiencies and notify the TDH, and warned that failure to correct the deficiencies could result in loss of Medicare payments to the hospital. Medicare payments constituted a significant portion, almost half, of the hospital's gross revenues. Understandably, Martin was concerned with the results of the Medicare inspection. Also understandable was Plaintiffs' concern. Antigen testing was considered an important part of Plaintiffs'

practice of environmental medicine and was also a source of revenue for Plaintiffs.

Among the several deficiencies found by Medicare was the preparation, compounding, labeling, and administration of antigens at the ECU by non-hospital personnel, i.e. Plaintiffs. Medicare required that any medication administered in the hospital had to go through the hospital's pharmacy, had to be properly labeled, and had to come from an FDA approved source. Apparently, antigens made by Plaintiffs were not from an FDA approved source.

Martin responded to the TDH letter by sending a letter to Plaintiffs on September 18, 1986, notifying them of the deficiencies reported by Medicare and directing that all antigen compounding and administration at the ECU would stop immediately until "a suitable alternative" was found. By letter of September 23, 1986, Martin expressed to Plaintiffs the conditions under which antigen testing could resume in the ECU. In the same letter, Martin notified Plaintiffs that transfer factor could not be used in the ECU without prior approval of the hospital's Institutional Review Committee. The basis for this was transfer factor's status as an "investigational drug." The letter also advised that patients staying at the ECU hotel could no longer receive hospital services, such as medication or lab testing, which required overnight nursing supervision. Last, the hospital would develop policies and procedures for the ECU's testing booth.

Martin testified that because Medicare found some violations, he realized other violations may be occurring which were not discovered. This prompted him to do further investigation into the use of transfer factor, the testing booth and the ECU hotel. By letter of October 20, 1986, Plaintiffs were informed that the ECU hotel was being closed.

After Martin's letter of September 18th, there followed a series of meetings and letters between Plaintiffs and Martin. On October 2, 1986, Martin, apparently believing Plaintiffs were not being cooperative, sent a letter to Plaintiffs advising them that all antigens were to be removed from the hospital and were not to be brought back, transfer factor had to meet certain standards before it could be used in the hospital, and that the testing booth was not to be used. Martin further advised Plaintiffs that he would inform the hospital's Credentials Committee of Plaintiffs' conduct so the committee could consider this at the time of Plaintiffs' reappointment and granting of privileges.

There was disagreement between Dr. Johnson and Mr. Martin as to whether FDA approval was necessary for Plaintiffs to use antigens in the hospital. Dr. Johnson believed, and received letters from some agencies to that effect, that FDA approval was not necessary if the antigen use involved a doctor making and administering the medicine to his own patients. Martin believed that for antigens to be used in the hospital, Medicare regulations had to be met which required FDA approval of the source of all medicines used in the hospital. The source of the antigens was Plaintiffs, and they were not an FDA approved source.

Dr. Johnson continued to press Martin to resolve the problem so that antigen testing and use could resume, and in December 1986, Martin expressed to Dr. Johnson and Dr. Juetersonke, Chairman of the ECU Committee, his belief that by early January 1987, antigen use could resume. This did not occur, and on January 26, 1987, Dr. Johnson wrote a letter to Dr. Juetersonke expressing concern over Martin's indifference and lack of effort to resolve the problems.

It is against this backdrop that Martin received the information from the hospital's pharmacy in January, 1987. The pharmacy expressed concern over the prolonged prescription of narcotics to two patients in the ECU. Martin states that he then presented the information to the hospital's MEC on January 22, 1987. There is some question about how long Martin had this information before presenting it to the MEC.

The minutes of the MEC meeting of January 22, 1987, indicate that the information Martin presented about Drs. Rea and Johnson did not pertain to concerns over the use of narcotics in the ECU. Mr. Martin related the problems surrounding antigen testing and use, and that one patient in the ECU

had been given transfer factor since the first of the year. Mr. Martin then expressed his belief that Plaintiffs were having a disharmonious effect on the rest of the staff. Finally, Martin expressed concern over two patients who had been in the ECU a long time, and asked that the charts of these patients be reviewed by doctors. Dr. Feingold suggested that the hospital bring in a doctor who was board certified in immunology and allergy to review the ECU and make recommendations. This was not done by the hospital. Instead, Dr. Linton, as Chairman of the MEC and Chief of Staff at the hospital, appointed an ad hoc committee (AHC) to review the charts, presumably of the two patients who had been in the ECU for over 124 days. Appointed to the committee were Drs. Feingold, Firstenberg, Mills and Haberer. Dr. Haberer, who was immediate past Chief of Staff, was appointed chairman of the committee. The doctors on the ad hac committee, except for Dr. Mills, along with Dr. Linton and Mr. Martin are the individual defendants in this suit.

The AHC did not meet to review the charts until Friday, February 13, 1987, some twenty-two (22) days after its appointment. The AHC reviewed the charts of four of Plaintiffs' ECU patients. Over the weekend, Dr. Haberer talked to Dr. Linton and Mr. Martin. Haberer expressed concern over the prolonged use of narcotics, the amount of narcotics usage, and the use of narcotics in combination with other central nervous system suppressants and psychotropic drugs. Haberer stated that Plaintiffs were running a "shooting gallery" in the ECU.

Linton and Martin met early on the morning of February 16th and made a decision to summarily suspend the privileges of Drs. Rea and Johnson. Dr. Firstenberg, as head of the department over ECU, was called and advised of the decision. Dr. Firstenberg questioned the necessity of the summary suspension and asked if there was another way to resolve the problem. Dr. Linton and Martin convinced him there was not. The facts which followed have been stated previously in this opinion.

Defendants Linton and Martin maintain that they were primarily concerned with pa-tient safety and welfare and this motivated their decision concerning the summary suspensions. Apparently, Dr. Linton, Martin and Dr. Haberer were the only ones who believed a summary suspension of privileges was necessary.

Of the three doctors on the AHC who examined the charts, only Dr. Haberer supported summary suspension. Drs. Mills and Feingold while acknowledging concerns over what the charts showed, testified they did not believe their review of the charts would result in summary suspension of privileges. As stated previously, Dr. Firstenberg, who had not reviewed the charts and was department head over ECU, was reluctant about the necessity for summary suspension, but bowed to the expressed concerns of Dr. Linton and Mr. Martin.

In conducting its investigation, the MEC did not follow hospital by-laws. Article VIII § 8.2 of the by-laws does provide that certain officials may summarily suspend privileges "whenever action must be taken immediately in the best interest of patient care ..." However, the initial investigation by the MEC did not follow the procedures set forth in art. VIII, § 8.1–1 through 8.1–5. Those sections provide for complaints about doctors to be submitted in writing to the MEC which is to then forward the complaint to the department head where the activities occurred. The department head is directed to investigate the matter or to appoint an ad hoc committee to investigate. A written report of the investigation is then to be sent to the MEC which then takes action.

Clearly those steps were not followed here as Dr. Linton appointed the ad hoc committee rather than forwarding to the department head the verbal complaint he had received from Martin. After the ad hoc committee met, no written report of the investigation was forwarded to the MEC as required by § 8.1–3. Instead, Dr. Haberer talked with Dr. Linton and Martin by phone, but did not speak with the other members of the MEC.

In reaching the conclusion that the suspension of Plaintiffs was not done without malice and in the reasonable belief that their actions were warranted by the facts known to them,

the Court is mindful of the deference which should ordinarily be given to hospital personnel who have to make decisions concerning patient safety and welfare.

It is clear to the Court, however, after listening to the evidence and observing the witnesses, that the actions of Dr. Linton, Dr. Haberer and Martin were motivated by concerns other than patient safety and welfare.

Primarily, this was the antagonism and conflict which had developed between Plaintiffs, Martin and Haberer in the past.

Martin had already told Plaintiffs that their conduct would be reviewed when they came up for reappointment. When notifying Dr. Johnson of the summary suspensions on February 16th, Dr. Linton stated that because of earlier problems between Johnson, Martin and Haberer and the indiscriminate use of narcotics he believed it was necessary to get another doctor to take care of ECU patients until they could look into the matter further.

It is important to note that when Dr. Linton and Martin made the decision to summarily suspend Plaintiffs neither one had reviewed a single chart. They took this drastic action on the basis of what they heard from Dr. Haberer, who had prior conflicts with Plaintiffs.

The minutes of the January 22, 1987, MEC meeting reflect Martin's attitude toward Plaintiffs. Dr. Firstenberg, a member of the ad hoc committee, expressed concern over collateral issues that were brought up against Plaintiffs. These collateral issues concerned problems between Plaintiffs and Haberer and Martin, which had occurred earlier. Dr. Firstenberg thought it was unfair to bring up those issues in the context of the summary suspension investigation.

Drs. Haberer and Linton also made negative references about Plaintiffs' attitudes.

Jim Dalton, Martin's immediate supervisor, testified that his impression from talking to Martin was that the ECU was becoming increasingly insolent. He also testified to his belief that the prior problems between Plaintiffs and Martin and Haberer, the perceptions that Plaintiffs were insolent and did not have much to do with other staff members,

and the concerns over ECU patients were all factors which contributed to the summary suspensions.

It is clear to the Court that by January and February of 1987, Martin wanted to remove Plaintiffs from BNECH. Dr. Haberer had been involved in some of these prior conflicts, and with Martin, convinced Dr. Linton that Plaintiffs were insolent, uncooperative and could not be talked to. This, coupled with Drs. Haberer and Lintons' attitude toward environmental medicine and concerns over the ECU led to the decision to summarily suspend Plaintiffs in the manner in which it was done.

It is also important to note, that while Dr. Linton and Mr. Martin say their main and only concern was patient welfare and safety, Plaintiffs were allowed to continue treating their ECU patients for two days after the suspensions, and all ECU patients, including the four whose charts were reviewed, were allowed to remain on the same treatment plan and drug regimen for at least three days after the suspensions. The ECU patients were allowed to be without any physician care for over a day. This was not remedied until Ruth Reed, Director of Nursing in ECU, wrote a memo requesting that this be corrected.

The Court cannot reconcile this conduct with the Defendants' professed belief that an emergency situation existed in the ECU which necessitated the immediate suspension of two doctors' privileges.

Further, the Court finds that it was not reasonable for Linton and Martin to suspend Plaintiffs' privileges as to all patients in the ECU. Undisputably, there was legitimate concern on the part of the doctors on the ad hoc committee, the MEC, and Dr. Linton and Mr. Martin over the drug regimen of two of the Plaintiffs' ECU patients. However, the Court finds that it was not reasonable to summarily suspend the privileges of Plaintiffs as to all of their ECU patients on the basis of information possessed by Linton and Martin. The testimony at trial indicates that much of the concern centered on the lack of explanation by Drs. Rea and Johnson in the patients' charts. Yet Plaintiffs were not giv-

en an opportunity to explain their treatment plans prior to their summary suspensions. The Court is convinced that the privileges of Plaintiffs would not have been summarily suspended were it not for the previous conflict between Plaintiffs and Haberer and Martin, the perceived arrogance of Plaintiffs, and, to some extent, disagreements over the legitimacy of the practice of environmental medicine. The Court further finds that the conduct and actions described above show malice on the part of these three Defendants toward Plaintiffs, and that the acts were intentional and willful.

The Court therefore finds that Defendants Linton, Haberer and Martin are not entitled to the immunity provided by art. 4495b, V.A.T.S.

■ The Court also finds that Defendants Drs. Firstenberg and Feingold did not act with malice and are, therefore, entitled to the immunity of art. 4495b. Additionally, Drs. Firstenberg and Feingold did not make or participate in the initial decision to summarily suspend the privileges of Plaintiffs.

The MEC received the case in the posture of the Plaintiffs already having been suspended and with some concerns over the use of narcotics and lack of explanation in the charts. The MEC, in supporting the decision of Dr. Linton and Martin, simply chose to "err on the side of caution."

### B. Closing the ECU

■ Mr. Martin, after checking with his superior, unilaterally made the decision to close the ECU on March 26, 1987. This was one day before the Fair Hearing. Since Plaintiffs only admitted patients at BNECH to the ECU, this decision by Martin had the effect of rendering meaningless, from a practical standpoint, any subsequent decisions about Plaintiffs' privileges which might be made by the Fair Hearing Committee, the MEC, or the hospital's Board of Trustees.

Defendants Martin and BNECH rely on the defense of legal justification or excuse. Since the Court has found that there was no agreement between Plaintiffs and BNECH which required the hospital to keep the ECU open, the Defendants argue that BNECH had an absolute right or privilege to operate its hospital as it wanted. This included the right to close the ECU. Defendants rely on the case of *Gillum v. Republic Health Corp.,* 778 S.W.2d 558 (Tex.App.—Dallas 1989, no writ).

While agreeing that the principle advanced by Defendants is true generally, the Court cannot view in a vacuum the decision by Martin to close the ECU.

Mr. Martin has given several different and conflicting reasons for the closing of the ECU. On some occasions Martin has stated that the decision to close the ECU was an economic one because the ECU was losing money. Yet in a memo to Jim Dalton in June of 1987, Martin lists the closing of the ECU as one of the reasons hospital revenue was down. The Court finds that Martin's decision to close the ECU was simply a part of Martin's efforts to remove Plaintiffs from BNECH. Apparently, none of the doctors, including Plaintiffs, who admitted patients to the ECU were notified in advance that the ECU would be closed. Martin did not discuss the decision with the Chief of Staff or the department head. When the ECU was closed, there were no patients there since Plaintiffs admitted almost all of the ECU patients. Martin saw an opportunity to keep Plaintiffs out of BNECH and seized it.

The Texas Supreme Court has held that, under certain circumstances, only good faith assertions of legal rights are protected when interfering with the contractual relations between third parties. *Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931 (Tex.1991).

Martin's actions of March 26, 1987, interfered with the contractual relations between Plaintiffs and their patients. Martin's assertion of his legal right to close the ECU was not done in good faith. He was attempting to ensure that his improper, and improperly made, decision to remove Plaintiffs from BNECH would not be affected by subsequent decisions by persons whom he did not control.

The Court, therefore, finds that Martin and BNECH are liable to Plaintiffs, under Plaintiffs' tortious interference claim, for the closing of the ECU.

The Court, however, finds that the damages from this extend from March 26, 1987, until December 15, 1987, when the hospital declined to reopen the ECU. This decision was made after what appeared to be good faith negotiations between Plaintiffs and the hospital to reopen the ECU. The hospital had gone so far as to locate a doctor to oversee the ECU. There were some legitimate concerns which the hospital believed needed to be resolved before the ECU could be reopened. These included developing and following proper procedures for the ECU and establishing proper oversight review over the ECU.

These concerns could not be worked out, and the hospital decided, as was its right, that it no longer wanted to operate the ECU. This decision was not made by Martin alone, and the Court is not convinced that this decision was motivated by malice or retaliation on the part of hospital officials.

### C. Damages

■ The Court has found that Defendants Bedford Northeast Community Hospital, Robert Martin, Dr. James Linton and Dr. Paul Haberer are liable to Plaintiffs for damages suffered by Plaintiffs as a result of the Defendants' summary suspension of Plaintiffs' privileges on February 16, 1987. The Court further finds that Defendants Bedford Northeast Community Hospital and Robert Martin are liable to Plaintiffs for the closing of the ECU on March 26, 1987. The damages sought by Plaintiffs from those two actions are the same. Plaintiffs seek lost earnings from the date of the summary suspensions through 1994.

The Court, however, finds that Plaintiffs are entitled to damages from the date of their summary suspensions, February 16, 1987, to December 15, 1987. The latter date being when Plaintiffs were informed that the Board of Trustees at BNECH decided against reopening the ECU.

Dr. Wayne Ruhter, an economist, testified that damages from the date of the summary suspensions could be calculated by determining the per diem of the 1987 damages and multiplying that figure times the number of days desired. Dr. Ruhter testified that the

amount of damages sustained by Plaintiffs in 1987 was $238,428.00. That yields a per diem figure of $653.23. Since Dr. Linton and Dr. Haberer are liable only for damages resulting from the summary suspensions, those two Defendants along with BNECH and Robert Martin are jointly and severally liable for $75,774.00 in damages from February 16, 1987 through June 11, 1987, the date when the hospital's Board of Trustees lifted the summary suspensions. Defendants Bedford Northeast Community Hospital and Robert Martin are jointly and severally liable for an additional $122,154.00 for damages from June 16, 1987 through December 15, 1987.

■ The Court has found that the Defendants acted with malice, intentionally and wilfully. However, this finding is tempered by the fact that Drs. Linton and Haberer, and Mr. Martin were legitimately concerned by the safety and welfare of the ECU patients. The Court finds that $100,000.00 exemplary damages should be awarded to Plaintiffs. The exemplary damages are assessed against all of the Defendants jointly and severally.

The Court will enter a separate judgment in accordance with this Order.

**SO ORDERED.**

### ORDER ON MOTIONS

Before the Court are:

(1) Plaintiffs' Post–Judgment Motions, which include a Motion to Correct Clerical Mistakes pursuant to Fed.R.Civ.P. 60(a), Motion for Amended or Additional Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(b), Motion to Alter and Amend the Judgment pursuant to Fed. R.Civ.P. 59(c) or, In the Alternative, Motion for Partial New Trial on Damages only Pursuant to Fed.R.Civ.P. 59(a);

(2) Defendants' Motion to Alter or Amend Findings and Judgment; and

(3) The parties' responses to each of the foregoing motions.

The Court **GRANTS** Plaintiffs' Motion to Correct Clerical Mistakes, and an Amended Final Judgment will be entered accordingly.

The Court grants, in part, Plaintiffs' Motion for Amended or Additional Findings of Fact and Conclusions of Law. Requested additional Findings of Fact number one under part II of Plaintiffs' Post–Judgment Motions is **GRANTED,** except that the Amended Judgment will reflect that costs are assessed against Defendants HCA Health Services of Texas, Inc., Bedford–Northeast Community Hospital, Inc. Robert Martin, Dr. Jim Linton, and Dr. Paul Haberer. Costs are not assessed against Defendants Dr. Richard Feingold and Dr. Barry Firstenberg. Additionally, Plaintiffs' requested additional findings of fact numbers 2, 3 and 4 are **GRANTED.** The remaining requests for additional findings of fact and conclusions of law are **DENIED.**

Plaintiffs advance two theories on their § 1 Sherman Act claim. First, Plaintiffs argue that the individual defendant physicians and BNECH conspired to remove Plaintiffs and eliminate the practice of environmental medicine from the hospital, and that this unlawfully restrained trade. Second, Plaintiffs argue that the closing of the ECU denied Plaintiffs the use of an essential facility which had the effect of restricting competition.

 As to the conspiracy claim, the court finds that in the context of a peer review process, BNECH and the medical staff are not legally capable of conspiring with each other for purposes of an antitrust claim. *Oksanen v. Page Memorial Hospital,* 945 F.2d 696 (4th Cir.1991); *Nurse Midwifery Associates v. Hibbett,* 918 F.2d 605 (6th Cir.). BNECH was not in competition with Plaintiffs. Plaintiffs presented evidence that BNECH competed with Plaintiffs in that Plaintiffs provided nutritional counseling to their patients, as did the hospital, and that Plaintiffs' provided antigens to their patients which competed with the medications given by the hospital. However, in examining the entire range of services offered by Plaintiffs and the hospital, the court cannot find that the giving of antigens, which the hospital did not give, and giving nutritional counseling are sufficient to make Plaintiffs and BNECH

competitors. Indeed, the evidence was that the presence of Plaintiffs and the Environmental Care Unit (ECU) was economically profitable for BNECH. The evidence showed that the closing of the ECU had an adverse economic impact on the hospital.

 On the other hand, members of the medical staff may be in competition with each other. On this level, the interests of the medical staff and the hospital are not the same. That is, they do not have a unity of economic interest insofar as their relationship with Plaintiffs. However, in the context of the peer review process, the hospital keeps the final decision-making authority for itself. Any decision of the medical staff is subject to review by the hospital Board of Trustees. Therefore, in the peer review context, the medical staff does not have the ability to carry out any anti-competitive designs which might stem from their competitive positions vis a vis Plaintiffs. However, as the *Oksanen* and the *Nurse Midwifery* cases hold, members of the medical staff can have independent and at times competing economic interests, and thus, are legally capable of conspiring with each other in violation of § 1. This does not mean, as the Fourth Circuit points out, that "every action taken by the staff satisfies the contract, combination, or conspiracy requirement of section one." *Oksanen,* at 706. As in *Oksanen,* Plaintiffs here seem to suggest that simply because the Defendant physicians acted as a group in the context of a peer review, that is sufficient to prove a conspiracy. As this court found in its Memorandum Opinion and Order of December 30, 1993, the actions of the individual Defendant physicians were not at all based on economic motives or because of any competition with Plaintiffs. Hospitals and medical staff have legitimate concerns about doctors who do not get along with other personnel or have a disharmonious effect on the other staff. In such circumstances, those officials can take proper steps to remove the offending physicians from practicing in their hospital. If in attempting to remove such a doctor, the staff or hospital take improper actions, as the court has found happened in this case, then liability may attach under

some theory of law, but not necessarily under the antitrust laws.

Thus, while the court has found that some of the Defendant physicians are liable to Plaintiffs for their conduct in the summary suspensions, that conduct and the reasons on which the Defendants acted are not of the type which implicate antitrust concerns. Therefore, the court affirms its earlier finding that the Defendant physicians did not conspire within the meaning of 15 U.S.C. § 1.

■ As to the closing of the ECU, the court has found that the individual Defendant physicians did not, and could not, play a role in that decision. The decision to close the ECU was the unilateral decision of BNECH and therefore, there can be no conspiracy within the meaning of § 1. Thus, Plaintiffs' claims under the "essential facility" doctrine are inapposite. Plaintiffs' claims are brought pursuant to § 1, which requires a combination or concerted action. Since the closing of the ECU was a unilateral act, that action cannot result in § 1 liability.

■ Since, the court has found that there was no conspiracy within the meaning of § 1, there is no need to examine the "restraint on trade" component of an antitrust claim. However, the court notes that in making this analysis, the "rule of reason" test would be the proper standard in this case. Under this standard, the test is whether the challenged conduct promotes or inhibits competition. In making this determination, the court must first determine the relevant market and then the effect of the challenged conduct on the relevant market. Plaintiffs contend that the relevant market in this case is the delivery of inpatient health care treatment and services at BNECH. The court does not agree. BNECH is located in Bedford, Texas, which is between Ft. Worth and Dallas, Texas. The evidence is that Plaintiffs had their office in north Dallas and that they had privileges at other hospitals in the Dallas area. The evidence is also that Plaintiffs' patients came from different parts of the United States and Canada. The court finds that, at the least, the relevant market is the delivery of environmental health care services in the Dallas–Ft. Worth, Texas, area. Plaintiffs did not adduce evi-

dence that competition was lessened in this market. In fact, Plaintiffs were the dominant players in this market, and continued to be after their privileges were suspended at BNECH. Plaintiffs offered evidence that their income was reduced because they were not able to admit patients to the ECU. However, no one was able to admit patients to the ECU after it was closed, and the court has found that the closing of the ECU was not a violation of § 1. The fact that a competitor's income may have been reduced by someone's conduct, does not mean that competition was impermissibly restrained. "The fact that a hospital's decision caused a disappointed physician to practice medicine elsewhere does not of itself constitute an antitrust injury." *Oksanen*, supra, at 708.

Finally, in its Memorandum Opinion and Order of December 30, 1993, the court awarded Plaintiffs exemplary damages in the amount of $100,000.00. The court now amends that Order to award each Plaintiff exemplary damages in the amount of $100,000.00, or a total of $200,000.00 in exemplary damages.

Any other relief requested in Plaintiffs' post-judgment motions not specifically granted in this order is hereby denied.

Defendants' Motion to Alter or Amend Findings and Judgment is **DENIED.**

### COSTS

Plaintiffs have submitted taxable costs in the amount of $33,397.51. These fall into four categories. Plaintiffs seek $300.00 for filing fees, $120.00 for appearance and subpoena fees, $6,759.27 in photocopying costs, and $26,218.24 for deposition transcripts.

The Court finds that Plaintiffs' are prevailing parties and should be awarded costs. As Defendants point out, Plaintiffs succeeded on only one of their claims, but each claim stemmed from the summary suspension of the Plaintiffs and the closing of the ECU. Plaintiffs were successful in showing that both of these actions were improperly taken and were awarded actual and punitive damages of nearly $400,000.00.

Pursuant to 28 U.S.C. § 1920, costs for photocopying and deposition transcripts are recoverable if a prevailing party can show that copies and the deposition transcripts were necessarily obtained for use in litigation. *Holmes v. Cessna Aircraft, Co.,* 11 F.3d 63 (5th Cir.1994). Further the party seeking such costs must offer some proof of the necessity. *Id.*

Plaintiffs, in an affidavit filed by their counsel before final judgment was entered, set forth the purpose and amounts of the costs they seek to recover. The affidavit, also states that these costs were necessarily obtained for use in this cause. The affidavit, however, does not detail how and on what the costs were incurred.

Having heard this case for almost five weeks, the Court is of the opinion that copying costs and deposition transcripts were necessarily obtained for use in this litigation. The case was document extensive and depositions were used extensively during the trial. However, because of the lack of specificity provided, the Court is unable to determine whether all or part of the $6,759.29 in copying costs and the $26,218.24 in deposition transcripts were necessarily obtained for use in this trial.

The attorneys are directed to confer to determine which of these can be agreed to. Plaintiff is then directed to submit, within twenty days from the date of this order, further documentation as to the items on which the parties do not agree. Defendants response will be due ten days after the date Plaintiffs submit their documentation, and Plaintiffs' reply will be due ten days after Defendants' response is filed. The Court will enter a separate order with respect to costs following the parties' submission of the requested information, and the court will enter an amended final judgment in accordance with the Memorandum Opinion and Order of December 30, 1993, this Order and the order to be entered with respect to costs.

**SO ORDERED.**