Richard H. WAGNER, M.D., Plaintiff,

v.

MAGELLAN HEALTH SERVICES, INC., Patricia Penhall, Sean Cull, Ron Gerstein, Dr. Robert Sullivan, Dr. Wirthman, Polly Pope and Dr. Bruce Roberts, Defendants.

No. 99 C 8235.

United States District Court, N.D. Illinois, Eastern Division.

June 21, 2000.

Michael J. Fleck, Law Office of Michael J. Fleck, Huntley, IL, Peter D. Michling, Weisz & Michling, Woodstock, IL, for Plaintiff.

Daniel J. Hofmeister, Jr., Brand & Novak, Ltd., Chicago, IL, Michelle F. Kavoosi, Kamensky & Rubinstein, Lincolnwood, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

Dr. Richard Wagner instituted this action alleging that he was "blacklisted" by managed care organization Magellan Health Services, Inc. ("Magellan") in violation of §§ 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. § 1 et seq. Dr. Wagner also alleges defamation, civil conspiracy and intentional interference with contractual relations. Magellan and the individually-named defendants (the "defendants") move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). I grant the motion as to Counts I—III, and I dismiss the remaining counts, IV—VI, without prejudice for lack of subject matter jurisdiction. To the extent that Dr. Wagner's response to the motion to dismiss seeks to add a RICO claim, it is denied, but his motion to amend the complaint is granted.

## I.

Richard Wagner is a licensed, board-certified psychiatrist with offices in Barrington, Illinois. Dr. Wagner also has staff privileges at Good Shepherd Hospital in Barrington, which require him to periodically be "on-call" for the hospital's emergency room. Magellan Health Services, Inc., ("Magellan"), is a managed care organization and a Delaware corporation with its principal place of business in Columbia, Maryland. Defendants Pengall, Gerstein, Sullivan, Wirthman, Pope, and Roberts are current or former employees of Magellan.

The events giving rise to this complaint began on January 20, 1998, when Dr. Wagner—who is not a Magellan network provider—was the on-call psychiatrist for the emergency room of Good Shepherd Hospital. On that night, a patient arrived by ambulance in severe emotional distress. The patient's primary care physician came to the hospital, and after he and Dr. Wagner conferred, Dr. Wagner admitted the patient, who had out-of-network benefits with Magellan. Thereafter, Magellan conducted an internal review of the case and decided not to certify the patient's hospital stay for payment. Nonetheless, Dr. Wagner refused to discharge the patient, believing it was in the patient's best interest to remain hospitalized. Magellan contacted Good Shepherd's Director of Psychiatry

to ask about Dr. Wagner and threatened to pull its contract with Good Shepherd because of the incident. During the patient's hospital stay, Magellan sent a letter to the patient via courier indicating that it would not authorize payment for the hospital stay; simultaneously, it sent a letter to the unit clerk at Good Shepherd indicating that the patient may "require support" upon reading the letter denying HMO benefit coverage. In response, Dr. Wagner spoke with defendant Sullivan, Magellan's regional medical director, about the treatment of his patient. Sullivan told Dr. Wagner he would discuss the situation with Magellan's CEO and renewed the threat of possible cancellation of Good Shepherd's contract with Magellan.

On November 4, 1998, another emergency psychiatric patient arrived at Good Shepherd when Dr. Wagner was on call. When a Good Shepherd social worker contacted defendant Pehnall at Magellan regarding the patient's insurance coverage, she was told that the patient could be treated by "anyone but Dr. Wagner." Magellan instructed the social worker to transfer the patient to another hospital despite the fact that medical stability was not established. Dr. Wagner informed the Magellan employee and defendant Cull that Magellan's attempt to transfer the patient without the attending physician's authorization was unethical and against the hospital's by-laws. The incident was basically repeated the next day, but Good Shepherd decided that the incoming patient would be seen by a physician other than Dr. Wagner. Another incident occurred on November 23, 1998, and Good Shepherd's medical director, Dr. Jacobs, was forced to intervene and confirm that a patient cannot be moved without following proper hospital procedures and COBRA statutes. On December 15, 1998, Dr. Wagner met with Dr. Jacobs, who told him that Magellan attempted to get Good Shepherd to deflect patients away from him and have him bypassed in the normal emergency room rotation, but the hospital refused Magellan's request. On October

14, 1999, a Magellan case was admitted to the psychiatric unit and defendant Pope of Magellan told the social worker that "I don't think the patient can see Dr. Wagner, we've had a lot of problems with Dr. Wagner." Dr. Wagner filed this action on December 17, 1999.

## II.

Federal Rule of Civil Procedure 12(c) permits a party to move for judgment after the parties have filed the complaint and answer. When considering a motion for judgment on the pleadings, I regard all well-pleaded facts as true, view them in the light most favorable to the plaintiff, and draw all reasonable inferences in favor of the plaintiff. *Hentosh v. Herman M. Finch Univ. of Health Sciences/The Chicago Medical School,* 167 F.3d 1170, 1173 (7th Cir.1999); *Frey v. Bank One,* 91 F.3d 45, 46 (7th Cir.1996) (standard is the same as Fed.R.Civ.P. 12(b)). I grant judgment on the pleadings only when it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief. *Forseth v. Village of Sussex,* 199 F.3d 363, 368 (7th Cir.2000). The complaint need only "narrate a claim," and need not depend on a particular theory of recovery. *Id.* at 367. Indeed, "a plaintiff may supplement the complaint with factual narration in an affidavit or brief. If the extra assertions make out a claim, then the complaint stands." *Albiero v. City of Kankakee,* 122 F.3d 417, 419 (7th Cir.1997) (citation omitted).

## III. *Antitrust Claims*

Dr. Wagner alleges that the defendants have conspired in an illegal boycott (Count I) and unreasonable restraint of trade (Count II) in violation of § 1 by preventing him from providing emergency psychiatric medical care at Good Shepherd to patients with Magellan insurance coverage. In Count III, Dr. Wagner alleges that the defendants have conspired to monopolize

the Barrington area market for emergency psychiatric services. The basis of Dr. Wagner's antitrust claims is that in retaliation for his refusal to accede to Magellan's wishes regarding patient care, Magellan has coerced or attempted to coerce various hospital personnel to refer his patients to other doctors or hospitals and to have him removed from the on-call rotation by threatening the loss of the hospital's contract with Magellan. These actions have harmed his ability to compete for emergency psychiatric patients, and he has suffered a corresponding loss of income from these patients who otherwise would have been in his care.

The defendants move for judgment on the pleadings claiming Dr. Wagner has failed to allege the existence of a conspiracy, a properly defined relevant product and geographic market, market power in the relevant market or facts comprising a specific intent to monopolize, or a cognizable antitrust injury.

### A. *Existence of Conspiracy*

 Section 1 of the Sherman Act prohibits contracts, combinations, or conspiracies unreasonably restraining trade or commerce. The fundamental prerequisite is unlawful conduct by two or more parties pursuant to an agreement, explicit or implied. Solely unilateral conduct, regardless of its anti-competitive effects, is not prohibited by Section 1. Dr. Wagner proceeds under a conspiracy theory in his § 2 claim as well.[1] Thus, both of Dr. Wagner's claims depend upon the existence of a viable conspiracy, and this is where the defendants claim he fails.

 The defendants argue, correctly, that there can generally be no conspiracy between a corporation and its employees or agents. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). If all Dr. Wagner alleges is a conspiracy between

the Magellan and its employees—the named defendants, he fails to allege an actionable conspiracy. In each of the antitrust counts in the complaint, the only conspiracy alleged is *between the defendants;* there is no specific allegation that the defendants conspired with anyone else.

Dr. Wagner responds that the conspiracy is not between Magellan and its employees, but between the defendants and certain Good Shepherd employees who actually implemented the boycott of Dr. Wagner. He points to other paragraphs in the complaint which are incorporated by reference into the specific counts and which explain how these employees carried out the instructions of Magellan. Dr. Wagner argues that the Hospital employees entered the conspiracy by diverting patients from him in accordance with Magellan's orders.

 This still falls short according to the defendants, because to establish an unlawful conspiracy, there must be evidence that two or more parties have *knowingly* participated in a common scheme or design to accomplish an anti-competitive purpose. *Albrecht v. Herald Co.*, 390 U.S. 145, 149, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *American Tobacco Co. v. United States*, 328 U.S. 781, 809–10, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946) (A conspiracy occurs only when the parties have reached "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement."). If the hospital employees did not have this shared purpose to restrain trade or monopolize, there can be no actionable conspiracy. While this is true, however, intent can be inferred from conduct, and an agreement may exist even when one of the co-conspirators is dragged into the conspiracy. In *MCM Partners, Inc. v. Andrews–Bartlett & Assoc.*, 62 F.3d 967 (7th Cir.1995), Judge Rovner wrote that "the 'combination or conspiracy' element of a section 1 violation

---

**1.** A section 1 claim and a section 2 conspiracy to monopolize claim require the same threshold showing—the existence of an agreement

to restrain trade. *See R. Posner, Antitrust Law: An Economic Perspective* 216 (1976).

is not negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion." *Id.* at 973 (listing string of authority for this proposition). In *MCM*, the co-conspirator defendant was coerced into agreeing to the anticompetitive conduct. Similarly, Dr. Wagner claims that the hospital was coerced into diverting psychiatric patients to other doctors when he was on-call, due to Magellan's market power and the threat to the Magellan/Good Shepherd contract.[2] According to Dr. Wagner, diverting patients to other psychiatrists not on-call was against hospital policy, so it is possible to infer that the hospital employees might have known they were doing something unlawful. Dr. Wagner has therefore sufficiently alleged a conspiracy.

### B. *Relevant Market*

■ The defendants claim they are entitled to judgment on Counts II and III of Dr. Wagner's complaint because he has not met "his prima facie burden of pleading facts necessary to demonstrate the product and geographical dimensions of a relevant antitrust market." Dr. Wagner defines the relevant market as emergency psychiatric services in the Barrington area. Patients with severe needs seek emergency room treatment from the closest hospital, and Good Shepherd is the only hospital so equipped in Barrington; attending physicians see such patients and provide these services. This market definition makes a certain amount of sense: if someone is suicidal or having a psychotic episode, for example, time is of the essence and resort should be had to the closest option. Although Magellan correctly observes that the alleged market is narrowly drawn, it is not inconceivable that Dr. Wagner can prove facts supporting his market definition. *See MCM Partners,* 62 F.3d at 976–977.

### C. *Challenges to Section 2 Claim: Market Power and Intent*

■ The defendants next claim that Dr. Wagner has failed to plead market power or the specific intent required for his section 2 claim. However, market power is not an element of a conspiracy to monopolize claim under section 2. *See United States v. National City Lines,* 186 F.2d 562 (7th Cir.1951). In Magellan's reply brief, it apparently seeks to also challenge the section 1 market power element. Although I need not consider arguments raised for the first time in a reply because the plaintiff has not had an opportunity to respond, *Estate of Phillips v. City of Milwaukee,* 123 F.3d 586, 597 (7th Cir.1997), Dr. Wagner defends his market power allegation in his response, so I will address it.

■ Dr. Wagner alleges that Magellan manages the behavioral care insurance benefits for roughly one in three insured Americans, which the defendants claim is insufficient as a matter of law, relying upon *Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic,* 65 F.3d 1406, 1411 (7th Cir.1995) (33% market share insufficient to infer market power). I agree that the alleged market share alone—which may even be less than 33% once uninsured patients, who often frequent emergency rooms, are taken into account—is insufficient in and of itself. However, market share is not the only indicator of market power, i.e. "the power to control prices or exclude competition." *U.S. v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391–92, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). The fact that Magellan was able to force Good Shepherd to act contrary to its policy and perhaps the law and exclude Dr. Wagner from seeing emergency patients might be sufficient to

---

**2.** In his brief, Dr. Wagner calls the hospital and its employees "unwitting" co-conspirators, but there is no such thing as an unwitting co-conspirator, because all conspiracies require some degree of intent. What he must mean is "unwilling," as were the co-conspirators in *MCM*.

show market power.[3]

A conspiracy to monopolize under Section 2 is somewhat different from its Section 1 counterpart because of its heightened intent element, i.e. concerted action by knowing participants who have a specific intent to achieve a monopoly. The defendants allege that Dr. Wagner did not plead facts to support an inference that Magellan has acted with specific intent. Courts are wary to dismiss antitrust cases on intent solely on the pleadings because evidence of intent is often in the control of the defendants. At this stage, Dr. Wagner's allegations of Magellan's deliberate and willful attempts to exclude him from seeing their patients will suffice.

### D. *Antitrust Injury*

More problematic is whether Dr. Wagner alleges an antitrust injury. To successfully maintain an action under either Section 1 or Section 2 of the Sherman Act, Dr. Wagner must allege an antitrust injury, that is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). The question, then, is whether the injuries alleged by Dr. Wagner are of the "type that the antitrust laws were intended to prevent." In so deciding, "[t]he court's focus must be upon competition in the allegedly restrained market." *T.O. Bell v. Dow Chemical Co.*, 847 F.2d at 1183 (5th Cir.1988), *citing Associated General Contractors v. California State Coun-*

cil *of Carpenters*, 459 U.S. 519, 539, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

Dr. Wagner claims that the defendants' actions prevented him from attending to and providing emergency psychiatric medical care to Good Shepherd patients with Magellan health coverage. In so doing, he has clearly alleged injury to his own business and professional interests, but this, alone, is insufficient. *See Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The antitrust injury doctrine requires that every antitrust plaintiff show that his loss results from actions that reduce output or raise prices to consumers. *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir.1992); *Ball Memorial Hosp. v. Mutual Hosp. Ins.*, 784 F.2d 1325, 1334 (7th Cir.1986) (antitrust injury results "from higher prices or lower output, the principal vices prescribed by the antitrust laws"). There is no allegation that the price of emergency psychiatric services has gone up as a result of Magellan's actions.[4]

The remaining question then is whether output is decreased by Magellan's actions, which I assume are violative at this juncture. Dr. Wagner claims that Magellan attempted to divert incoming emergency psychiatric patients from him. So long as these patients were treated by another qualified physician, there has only been a reduction in suppliers, not in the output of patient care. Dr. Wagner does not allege that any patients were denied emergency psychiatric treatment or were treated by unqualified doctors. Nor did the hospital

3. I am far from certain that Dr. Wagner and Magellan can be deemed "competitors," but the defendants do not challenge this or any of the substantive merits of the case, so Dr. Wagner's allegations are sufficient.

4. The price issue is difficult to gauge in this type of case. One of the goals of Magellan to exclude Dr. Wagner may have been to control its costs by opting instead for physicians who tend not to admit patients. Efforts by firms to controls costs are generally permissible,

however, particularly when there is no allegation of price impact. Magellan decided that the patient at the crux of this case was not covered anyway, so there was no cost increase to Magellan with the exception of the cost of the courier. Part of the goal of managed care organizations is to provide hospitals and doctors with "incentives"—or prod them with sticks like nonpayment—to control costs and thus maximize profits.

682

"ship" emergency patients to other hospitals outside of Barrington. According to the facts alleged in Dr. Wagner's complaint, Good Shepherd refused attempts by Magellan to send emergency patients elsewhere.

"The antitrust laws ... were enacted for the protection of competition, not competitors". *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). Dr. Wagner has not alleged any change in the price of emergency psychiatric services or that the consumers of such services have otherwise suffered or have less of a market choice,[5] other than their ability to select Dr. Wagner, as a result of defendants' actions. *See e.g. Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). Thus, Dr. Wagner simply fails to allege an actual injury to competition. "Without any allegation as to how market-wide competition will be affected, the complaint fails to allege a claim on which relief may be granted." *Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.*, 129 F.3d 240, 245 (2d Cir.1997).

Dr. Wagner attempts to rely on a single Eleventh Circuit case, *Ertag v. Naples Community Hospital*, 121 F.3d 721 (11th Cir.1997) (unpublished). I find *Ertag* factually distinguishable because an entire category of physicians was precluded from performing a service and participating in a given market. Moreover, the *Ertag* court disagreed with the district court's determination that the plaintiff would not be an efficient enforcer of the antitrust laws, stating that a "court need not seek out the most efficient enforcer of antitrust laws." If Dr. Wagner could allege an injury to competition, he would be an efficient enforcer because he is in a position to witness to the impact on emergency room patients. Moreover, the Seventh Circuit takes a more restrictive stance toward antitrust injury. In *BCB Anesthesia Care, Ltd. v. Passavant Mem. Area Hosp. Assn.*, 36 F.3d 664, 668 (7th Cir.1994), the Seventh Circuit affirmed the dismissal of a § 1 claim based on a hospital's termination of plaintiffs nurse-anesthetists' exclusive provider contract. The court concluded that one hospital's staffing decision cannot give rise to a § 1 claim and that "[a] staffing decision does not itself constitute an antitrust injury." *Id.* at 667–69. (citing exhaustive authority from eight circuit courts and numerous district courts). *See also Baglio v. Baska*, 940 F.Supp. 819, 829 (W.D.Pa.1996) ("individual physician's loss of income or patient referrals do not establish an antitrust injury"); *Rea v. Hospital Corporation of America*, 892 F.Supp. 821, 834 (N.D.Tex.1993) ("The fact that a competitor's income may have been reduced by someone's conduct, does not mean that competition was impermissibly restrained."); *Purgess v. Sharrock*, 806 F.Supp. 1102, 1106–07 (S.D.N.Y.1992) (absent evidence that the defendants' conduct threatened competition or adversely affected consumer choice, the financial losses sustained by doctor are merely injuries as a competitor and not actionable under the antitrust laws); *Leak v. Grant Medical Center*, 893 F.Supp. 757, 763 (S.D.Ohio 1995) *aff'd* 103 F.3d 129 (6th Cir.1996) (no antitrust injury even where some patients' managed care insurance plans limit them to services offered by the defendant); *Levine v. Central Florida Medical Affiliates, Inc.*, 864 F.Supp. 1175, 1180 (M.D.Fla. 1994) (alleged blacklisting not an antitrust injury where plaintiff had privileges and could compete at other hospitals); *Feldman v. Palmetto General Hospital*, 980 F.Supp. 467 (S.D.Fla.1997) (dismissed case because physician's injuries from denial of staff privileges, exclusion from HMOs and PPOs, and blacklisting did not amount to antitrust injuries); *Korshin v. Benedictine Hospital*, 34 F.Supp.2d 133 (N.D.N.Y.1999) (dismissing action by anasthesiolgist whose

5. Choice of physician should not be a factor given Dr. Wagner's definition of the relevant market as *emergency* psychiatric services available to Barrington-area patients in acute need. The issue is whether the services were available, not who provided them.

contract with three hospitals was terminated when they entered into an exclusive services contract with a group of physicians of which he was not a member for lack of antitrust injury).

█ Nothing in the complaint suggests that patients were turned away or denied emergency psychiatric services. In fact, the complaint leads to the opposite conclusion, since it states that in the one case Good Shepherd acceded to Magellan's demands that Dr. Wagner be avoided, the patient was simply seen by another hospital physician. I am not required to ignore facts set forth in a complaint and exhibits that undermine the plaintiff's claim. *Hamilton v. O'Leary,* 976 F.2d 341, 343 (7th Cir.1992). Dr. Wagner is not precluded but has continued to practice at Good Shepherd in the emergency psychiatric services market. The only restraint alleged is that he may not treat patients who arrive at the emergency room and have Magellan health coverage. Since that time, Good Shepherd has refused Magellan's request to remove Dr. Wagner from the on-call rotation or deflect patients from him. Absent allegations raising an inference of any injury to competition and given allegations in the complaint raising the opposite inference of injury only to Dr. Wagner, I must dismiss the antitrust claims.

### IV. *State Claims*

█ Having decided Dr. Wagner's antitrust claims fail for lack of a cognizable antitrust injury, I lack subject matter jurisdiction over the remaining claims under state law. Because no discovery has taken place to date in this case, I dismiss the state law claims without prejudice so that Dr. Wagner can pursue them in the more appropriate state forum. The relationships between physicians, hospitals, and health management organizations implicated in this case are important areas of state interest and better dealt with in Illinois state court.

6. Dr. Wagner claims Magellan engaged in

### V. *Attempt to Add RICO Claims*

In his response to the defendants' motion for judgment on the pleadings, Dr. Wagner claims that the facts alleged in his complaint support a claim under the Federal Racketeering Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and asks that I add this count to his complaint. Defendants object to this late request and maintain that such action would be futile in any event.

█ "Having specified the wrong done to him, a plaintiff may substitute one legal theory for another without altering the complaint." *Albiero v. City of Kankakee,* 122 F.3d 417, 419 (7th Cir.1997). However, Dr. Wagner seeks to use mail and wire fraud as predicate acts to constitute racketeering activity, and Federal Rule of Civil Procedure 9(b)'s mandate that a plaintiff plead "all averments of fraud [with] particularity" applies equally to allegations of fraud in a civil RICO complaint. *See Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.,* 927 F.2d 988, 992 (7th Cir.1991). Although Rule 9(b) requires that a RICO plaintiff provide only a general outline of the alleged fraud scheme, the complaint must, at minimum, describe the predicate acts with some specificity and "state the time, place, and content of the alleged communications perpetrating the fraud." *Id.* A RICO complaint must also include a "person", an "enterprise" and a "pattern of racketeering activity", and such elements must be pled separately in the complaint. *R.E. Davis Chemical Corporation v. Nalco Chemical Co.,* 757 F.Supp. 1499, 1507 (N.D.Ill.1990). Dr. Wagner outlines the basics of the RICO scheme and players in his response, but even reading this in conjunction with his complaint, he has failed to (1) plead the mail and wire fraud claims with the requisite specificity, or (2) identify a distinct enterprise or "racketeering activity."[6] *Bachman v. Bear Stearns & Co.,*

"one or more schemes or artifices to interfere

178 F.3d 930, 932 (7th Cir.1999) ("A firm and its employees, or a parent and its subsidiaries, are not an enterprise separate from the firm itself.") Therefore, what Dr. Wagner is really seeking is to amend his complaint.

■ The defendants protest Dr. Wagner's inopportune timing, see *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101 (7th Cir.1984) ("it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss"), but do not show that they would be prejudiced by such amendment. *See Doherty v. Davy Songer, Inc.,* 195 F.3d 919, 922, 927 (7th Cir.1999) (leave may be denied due to delay, but the delay must unduly prejudice the opposing party). Leave to amend "shall be freely given when justice so requires," Fed.R.Civ.P. 15(a). Dr. Wagner may amend his pleadings and attempt to reallege the mail and wire fraud or other RICO predicate offenses.

## VI. *Conclusion*

Because Dr. Wagner has not alleged an antitrust injury, I grant the defendants judgment on the pleadings on the antitrust claims in Counts I—III. I dismiss without prejudice Mr. Wagner's remaining state law claims for lack of subject matter jurisdiction. Dr. Wagner's motion to amend his complaint is granted. Any amended complaint shall be filed within twenty-one days from the date of this order.

with and control or destroy plaintiff's emergency psychiatric practice," through extortion. He claims the pattern of racketeering activity is based on the predicate acts of mail fraud and wire fraud, but he fails to specify the nature of the mailings and wire communications—and the misrepresentations contained therein—and how they relate to the scheme to defraud.